UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ALMA T. MCBROOM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2:06-CV-767-MEF-SRW |
| ) | |
| JOHN E. POTTER, et al., ) | |
| ) | |
| Defendants. ) | |

**EVIDENTIARY SUBMISSIONS IN SUPPORT OF THE MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT OF THE
AMERICAN POSTAL WORKERS UNION, AFL-CIO**

Comes now defendant American Postal Workers Union, AFL-CIO ("APWU" or "National Union") and, in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure, respectfully submits the following attached documents as evidence supporting it's motion to dismiss or, in the alternative, for summary judgment.

1.     Exhibit 1: Declaration of Terry Stapleton

       Exhibit A to Exhibit 1: Constitution and Bylaws

       Exhibit B to Exhibit 1: Article 15 of the Collective Bargaining Agreement

2.     Exhibit 2: Opinion in 99-4835 (WGB) (D. N.J.)

Dated:__February 20, 2007_____         Respectfully submitted,

                                          O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                          By:_____/s/ Brenda Zwack_____
                                              Brenda C. Zwack (D.C. No. 482673)
                                              *Admitted Pro Hac Vice*
                                              1300 L Street, NW, Suite 1200
                                              Washington, DC 20005-4126
                                              Tel (202) 898-1707/Fax (202) 682-9276
                                              bzwack@odsalaw.com


                                          NAKAMURA, QUINN & WALLS LLP

                                          By:____/s/ Patrick Nakamura_____
                                              Patrick K. Nakamura
                                              Alabama Bar No. ASB-1814-A64P
                                              2204 Lakeshore Drive, Suite 130
                                          Birmingham, AL 35209
                                              Tel (205) 870-9989/ Fax (205) 803-4143
                                              nakamura@nqwlaw.com

                                          Attorneys for the American Postal Workers Union,
                                          AFL-CIO

**Certificate of Service**

I hereby certify that I have this day caused the following people to be served by first class mail postage pre-paid and (with the exception of Alma McBroom) through the Court's electronic filing system with a copy of the foregoing Motion to Dismiss, or in the Alternative, for Summary Judgment of the American Postal Workers Union, AFL-CIO; Memorandum of Law in Support of the Motion to Dismiss; and the Submission of Evidence supporting the foregoing Motion:

Alma T. McBroom
921 Hugh St.
Montgomery, AL 36108

Stephen Michael Doyle
United States Attorney's Office - ALM
Middle District of Alabama
PO Box 197
Montgomery, AL 36101-0197

William Post Roberts, II
Howell, Sarto & Howell
P.O. Box 681864
147 E. Main Street
Prattville, AL 36067

Dated:_February 20, 2007_____          ____/s/ Patrick Nakamura_____

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALMA T. MCBROOM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06-CV-767-MEF-SRW |
| | ) | |
| JOHN E. POTTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF TERRY R. STAPLETON

I, Terry R. Stapleton, in lieu of an affidavit as permitted by 28 U.S.C. Section 1746, declare as follows:

1.      I am the Secretary-Treasurer of the American Postal Workers Union, AFL-CIO ("APWU" or "National Union"). My duties as Secretary-Treasurer of the APWU are defined by Article 7, Section 1(c) of the Constitution and Bylaws of the APWU ("APWU Constitution"). Under the supervision of the President, among other duties, the Secretary-Treasurer keeps a record of all proceedings, "and all other records of the Union. He/she shall be the custodian of the official seal and shall issue all charters." APWU Constitution attached hereto as Exhibit A.

2.      The APWU is an unincorporated labor organization with its headquarters at 1300 L Street, N.W., Washington, DC 20005. The APWU has more than 1,600 locals located in every state and territory of the United States.

3.      The Montgomery Area Local is a local chartered by the APWU pursuant to Article 16, Section 5(b) of the APWU Constitution. It is an autonomous unincorporated labor organization with its own constitution, bylaws and officers. It is separate and distinct from the

# EXHIBIT 1

APWU with which it is affiliated. The APWU Constitution provides at Article 16, Section 6(c) that all affiliated locals shall be fully autonomous. Under this provision of the Constitution, Local Unions have complete autonomy from the National Union with respect to their internal affairs. See Exhibit A.

4.      The Montgomery Area Local has been designated Local 323, but this designation is ordinarily used for accounting purposes only.

5.      Connie Friedman is the President of the Montgomery Area Local. Friedman was elected President of the Montgomery Area Local by the membership of the Montgomery Area Local. Friedman is not now, and has never been, an officer or employee of the National Union.

6.      It is my understanding that Vanessa Gordon is or was a steward with the Montgomery Area Local. Gordon is not now, and has never been, an officer or employee of the National Union.

7.      The Montgomery Area Local maintains its own treasury separate and apart from the National Union. The Montgomery Area Local is free to spend its treasury as it sees fit, in accordance with its constitution and bylaws. The Montgomery Area Local has the unfettered right to self-govern its own affairs, including the right to determine when to schedule meetings and to set the agenda for those meetings, the right to hire and fire employees, the right to retain vendors and the right to conduct business in the Local's name.

8.      The collective bargaining agreement between the APWU and the United States Postal Service ("National Agreement") at Article 15 provides a grievance-arbitration procedure to resolve disputes, differences, disagreements or complaints between the parties to the Agreement related to wages, hours and conditions of employment. A copy of Article 15 of the

2

National Agreement is attached hereto as Exhibit B.

9.     The grievance procedure consists of three steps leading up to and ultimately culminating in final and binding arbitration. Local union affiliates have sole jurisdiction and the sole responsibility for filing and processing grievances at Steps 1 and 2 of the grievance-arbitration procedure. The National Union has no authority to get involved with grievances initiated at the local level until they are appealed to Step 3 of the grievance procedure. The National Union handles grievances at Steps 3 and arbitration.

10.     Local union affiliates have complete autonomy to select, appoint, certify, remove and decertify Step 1 and 2 stewards to represent members of the bargaining unit within the local's jurisdiction. It is not within the National Union's jurisdiction and the National Union is without authority to select, appoint, certify, remove or decertify local union stewards.

11.     The National Union did not select, appoint or certify Vanessa Gordon to be a steward for the Local. The National Union did not remove Gordon from being a steward or prevent her from performing steward duties. These decisions would be made by the Montgomery Area Local.

12.     The National Union had no knowledge of any of the actions alleged in Alma McBroom's Complaint. McBroom never contacted the National Union to complain of any of the actions alleged in the Complaint.

13.     In any case, Local Unions make the determination whether to pursue individual grievances without any input from the National Union. The National Union cannot reinstate a grievance once a Local Union decides not to pursue it. The Local's decision not to pursue a grievance is final. The National Union has no authority to compel a Local to either proceed or

decline to proceed with a grievance and in no way can the National Union change the Local's decision, once made.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 16, 2007.

Terry R. Stapleton

_____
Terry R. Stapleton

4

# CONSTITUTION

## AND

## BYLAWS

## OF THE

## AMERICAN POSTAL

## WORKERS UNION, AFL-CIO

### AS AMENDED AUGUST 16, 2002

# EXHIBIT A

## TABLE OF CONTENTS

PAGE

PREAMBLE                                          iv

OFFICERS' OATH OF OFFICE                          v

MEMBERS' BILL OF RIGHTS                           vi


ARTICLE

| | | |
|---|---|---|
| 1 | NAME | 1 |
| 2 | OBJECTIVES | 1 |
| 3 | MEMBERSHIP | 3 |
| 4 | JURISDICTION | 6 |
| 5 | CONVENTIONS | 6 |
| 6 | REPRESENTATION | 8 |
| 7 | GENERAL OFFICERS | 10 |
| 8 | DEPARTMENT & ADMINISTRATIVE OFFICERS | 12 |
| 9 | DIVISION OFFICERS | 16 |
| 10 | ELIGIBILITY TO RUN AND HOLD NATIONAL, STATE, OR LOCAL OFFICE | 21 |
| 11 | NOMINATIONS | 22 |
| 12 | ELECTION PROCESS | 29 |
| 13 | NATIONAL EXECUTIVE BOARD, EXECUTIVE COUNCIL, AND COMMITTEES | 32 |
| 14 | RECALL | 35 |
| 15 | LOCAL & MEMBERSHIP PROTECTION | 36 |
| 16 | FISCAL YEAR – REVENUES AND CHARTERS | 44 |
| 17 | SUBORDINATE BODIES | 49 |
| 18 | REFERENDUM | 49 |
| 19 | NATIONAL & LOCAL OFFICERS' BENEFITS | 51 |
| 20 | LOCALS, AREA LOCALS, STATE AND REGIONAL ORGANIZATIONS | 53 |
| 21 | SUCCESSION OF OFFICERS AND VACANCIES | 53 |
| 22 | AMENDMENTS | 54 |
| 23 | STRIKE SANCTION | 54 |
| BYLAWS | | 56 |

PREAMBLE

We, the postal workers of America, in order to form a more perfect union establish this Constitution.

We, who come from the diverse crafts and divisions, believe that in unity there is strength.

We believe that all members of labor have the right to economic, political and social justice.

That all men and women have the inherent right to earn a living and to be justly paid for the services they perform.

That all workers have the right to expect to have decent shelter, food and clothing.

That they have the right to see that their children have the best of education. The investment of the worker's lifeblood in giving service gives him that right.

We further believe that all men and women are created equal with the right to determine their own destiny and to participate in the forces and events that affect them.

We believe that all workers have the right, regardless of race, color, creed, sex, sexual orientation, nationality, handicap, political affiliation, age, or religion to hold their heads high and to have respect for themselves as individuals.

We believe, therefore, that in the spirit of the Declaration of Independence and the U. S. Constitution, all men and women are free and have the right to come together to promote the common cause of all.

We also believe that all members have certain basic rights within our Union and shall be secure in those rights. In order to give life to the Preamble to this Constitution, and to the Constitution itself, the Members' Bill of Rights has been established.

OFFICERS' OATH OF OFFICE

I, _____(name)_____, having been duly elected to office in the ___(state)___(local)___ of the American Postal Workers Union, AFL-CIO, do solemnly pledge to uphold the Constitution and Bylaws of the American Postal Workers Union, AFL-CIO and of the ___(state)___(local)___.

I further pledge to perform the duties of my office to the best of my ability.  I promise that at the conclusion of my term of office, I will turn over to my successor all books, papers, records, and documents that are the property of the APWU ___(state)___(local)___.

Last but not least, I promise to purchase only union made articles, whenever available. Failure to perform any of the above will mark me as an individual devoid of honor and destitute of integrity.

MEMBERS' BILL OF RIGHTS

1.     Every member has the right to be respected as a human being.

2.     Every member has the right to be respected as a brother or sister of this Union.

3.     Every member has the right to freedom of speech and the right to be heard.

4.     Every member has the right to the freedom to listen.

5.     Every member has the right to the freedom of the press.

6.     Every member has the right to participate in the activities of this Union.

7.     Members shall not be denied the right to seek any office or the right to vote in this Union because of race, color, creed, sex, sexual orientation, nationality, handicap, political affiliation, age or religion.

8.     Every member has the right to support the candidate of his/her choice and to participate in that right with others.

9.     Every member has the right to a fair trial, to be represented by an individual of his or her choice and to proper appeal procedures.

10.    Every member has the right to be secure in his or her basic rights without fear of political, economic, physical or psychological intimidation.

ARTICLE 1

NAME

The name of this organization shall be the American Postal Workers Union, AFL-CIO, hereinafter known as the APWU.

ARTICLE 2

OBJECTIVES

SEC. 1.  It shall be the objective of the APWU to secure through collective bargaining and legislative effort a safe and healthy work environment, better working conditions and a better standard of living for the members of the APWU and their families.

SEC. 2.  The APWU affirms its belief in a single union of all postal workers in non-supervisory levels.  The APWU will make every effort to bring into being a single union of all postal workers by mergers with other postal unions, and initiating intensive all-out organizing campaigns reflecting the APWU philosophy.

SEC. 3.  The APWU will vigorously oppose any labor unions outside the Postal Service moving into the Postal Service union field.

SEC. 4.  The APWU will call on the American Federation of Labor-Congress of Industrial Organizations (AFL-CIO), and its President, to aid in the cause of merging all postal unions into one single union.

SEC. 5.  The APWU will continue to organize the unorganized.

SEC. 6.  To unite within one organization, regardless of race, color, creed, sex, sexual orientation, nationality, handicap, political affiliation, age, or religion, all employees under the jurisdiction of the APWU.

SEC. 7.  To educate our membership and the general public in the history of the Labor Movement and to develop and maintain an intelligent and dignified membership to vote and work for the election of candidates who favor the passage of improved legislation in the interest of all labor.  To work for the repeal of laws which are unjust to labor and to the postal workers such as the denial of the right to strike and the denial of the right to support political candidates of their choice; and to educate all members in the area of economic, political and social justice.

SEC. 8.  To engage in legislative, political education, civic, welfare and other activities which further, directly or indirectly, the joint interests of the membership of this Union in the improvement of general economic and social conditions in the United States of America.

SEC. 9. (a)  To work as an autonomous union affiliated with the AFL-CIO, together with other national and international unions for the solidification of the entire Labor Movement.

(b)   The National Executive Board may provide assistance, financial and otherwise, to labor and other organizations in the United States and other parts of the world having purposes and objectives similar or related to those sought by this Organization.

SEC. 10.   The APWU is established as an industrial union, including in its membership postal workers of all divisions who are not classified as supervisors.   Its top leadership shall consist of a President, Executive Vice President, and Secretary-Treasurer.

SEC. 11. (a)  The American Postal Workers Union shall request and make every effort to secure a meeting with the National Association of Letter Carriers, a minimum of once a year, for the sole purpose of discussing and moving in the direction of eventual merger.

(b)  Also, the same type of meetings shall be conducted, a minimum of once every two (2) years, with the other postal unions (in the United States) that represent postal workers in non-supervisory levels.

**SEC. 12.   The APWU shall encourage the formation of state and area local / local retiree chapters of the APWU Retirees Department in every state and territory of the United States, in order that all APWU dues-paying retirees and their families shall have access to state and area local / local APWU Retirees Department chapters to continue to fight for those issues which affect APWU members, retirees, and their families.**


ARTICLE 3

MEMBERSHIP

SEC. 1.   Any non-supervisory employee, regardless of level or grade, within the jurisdictional claim of the APWU is eligible for membership.   Those accepted for membership shall pay full per capita tax plus whatever dues may be required by his/her local union.   A member's good standing status shall not be affected by reason of the fact that his/her paycheck for the payroll period in which his/her dues deductions are made is insufficient to permit such dues deductions, by reason of illness, injury, pregnancy leave, lay-off**,** disciplinary suspension**,** lockout or strike**.**   The National Union shall not charge the locals for per capita tax on these employees during the period, but shall through their own resources keep that member in good standing to protect his/her health coverage and any other benefits contingent on that good standing.

SEC. 2.   No person eligible under the above provisions shall be denied membership because of race, color, creed, sex, sexual orientation, nationality, handicap, political affiliation, age, or religion.

SEC. 3.  HONORARY MEMBERSHIP.   Any person whose name has been submitted to the National Secretary-Treasurer at least thirty (30) days prior to the national convention may be elected to honorary membership by a majority vote of the national convention.

Local unions shall have power to confer honorary local membership in their respective unions.  Such members shall be known as honorary members.  No honorary member shall be eligible to hold national office or be seated as a delegate at a convention, nor shall he or she have the right to vote.

SEC. 4.  (a) RETENTION OF MEMBERSHIP.  Local unions shall be granted the right to allow members of their organization who have resigned from employment in an APWU bargaining unit, or who may have been promoted to positions exercising supervisory authority, the right to maintain their membership without voice or vote.  Members who held supervisory positions and were members of the National Postal Transport Association on July 1961 may continue to retain membership with the right to vote.

(b)  No national, regional, state or local officer in the APWU can be removed from his or her office for duly authorized Union activities other than through the procedures spelled out in the National Constitution.

(c)  Members of this Union who retire from employment in an APWU bargaining unit may maintain full membership with all rights of such membership by continuing to pay full per capita taxes to the APWU plus whatever local dues may be required by their local union.  They shall receive a ballot from the division last served while on active duty.

Retirees whose APWU full dues/per capita payments have lapsed, due to extenuating circumstances, may appeal for reinstatement to the APWU National Secretary-Treasurer, providing supporting documentation and accompanied by written verification by the local president and secretary-treasurer.  The APWU Retirees Department Director shall review retiree appeals for full dues membership reinstatement, report a recommendation to the APWU National Secretary-Treasurer who shall present the appeal, findings, and recommendation to the National Executive Board for a final determination.

(d)  All retirees who desire to become members of the APWU Retirees Department shall pay Twenty-Four Dollars ($24.00) per year per capita tax to the National Union.  Such retirees shall elect five (5) delegates to the national convention.  Each Retiree National Convention Delegate will have a voice and one (1) vote at the national convention.  The five (5) Retiree National Convention Delegates shall be paid necessary expenses to attend the national convention.

SEC. 5.  Federal classified employees may be accepted as associate members for Health Plan participation only.  They shall pay Thirty-Five Dollars ($35.00) per annum for this privilege, Five Dollars ($5.00) of which shall go to the local in the area where the federal-classified employee is employed.

SEC. 6.  MEMBERS-AT-LARGE.  Any employee eligible for membership in the APWU, AFL-CIO, may become a member-at-large (MAL), provided that no such membership be granted in any installation where an APWU local exists.

SEC. 7.  All members of the APWU shall be in their respective division.

SEC. 8.  OFFICIAL ORGAN.  The official organ of this organization shall be published through the headquarters of the APWU at Washington, D.C.  Membership in this organization shall include subscription to the official organ.  The subscription price of the official organ of this organization to non-members shall be determined by the National Executive Board.

SEC. 9.  PROHIBITED.   No criticism, reflection, argument or debate, touching on any member's race, color, creed, sex, sexual orientation, nationality, handicap, political affiliation, age or religion shall be allowed at any meetings of the APWU.


ARTICLE 4

JURISDICTION


SEC. 1.  The jurisdiction of the APWU includes all postal and mail handling operations, including but not limited to all work or operations directly or indirectly related to postal and mail handling operations, whether performed by employees of the U.S. Postal Service or any other employer, and including any operations that transmit message by electronic or other means, and including personnel in headquarters, regional offices and technical support operations.


ARTICLE 5

CONVENTIONS

SEC. 1. (a)   National conventions of this Union shall convene biennially in even-numbered years on any Monday in July or August, with the exception of the weeks of the 4th of July and last week of August.

(b) The National Executive Board shall be empowered to select the site of the national convention city and to alternate sites by geographical location.

Any local union of the American Postal Workers Union desiring to host the national convention shall submit detailed plans to the National Executive Board not later than three (3) years prior to January 15th of the year it desires to host the national convention.

All conventions are to be conducted between the hours of 10 a.m. to 4 p.m. Monday through Friday.

(c) Local unions submitting invitations shall be required to meet the minimum criteria for housing and convention facilities as established by the National Executive Board.

SEC. 2.  Arrangements for the administration and conduct of the national convention shall be under the supervision and authority of the National Executive Board of the APWU.  The National Executive Board, at the request of the host local, shall have authority to change the dates and/or location of any national convention in the event of local or national emergency.

SEC. 3.  A Screening Committee, including division representatives, shall be appointed to screen resolutions submitted with a view to eliminating repetitive resolutions and shall have authority to consolidate all resolutions containing the same basic subject matter.

SEC. 4.  All division meetings in the year of the national convention will be held on the Saturday and Sunday immediately prior to the National convention.

**Division meetings held in the year between national conventions shall conform to a regular format.  Off-year division meetings shall be for a minimum of three (3) full days, dedicating specific time to training and allocating such time as to be determined by the Division Director to address business matters of the division, including discussion of and voting on resolutions.  No division meeting shall be organized in such a way as to preclude an appropriate business session or sessions.**

**Resolutions shall be submitted, in writing, to the Division Director at least thirty (30) days in advance of the division (craft) conference.**

**The Division Director shall be responsible for announcing the agenda for each division meeting with sufficient advance notice.  The Division Director shall cause a record of each Division meeting to be distributed to attending locals after such meetings.  He/she shall also submit to the Secretary-Treasurer for inclusion in the next national convention resolution book(s), such resolutions as may be adopted by the body of an off-year division meeting.  Resolutions adopted by division meetings immediately prior to the national convention shall be promptly submitted to the Screening Committee to be brought forward in the national convention.**

SEC. 5.  The national convention magazine shall be the responsibility of the Secretary-Treasurer.  In no instance shall there be any advertising in said magazine.

SEC. 6.  No national officer shall have more than one (1) vote in convention and he/she shall not be permitted to vote by proxy for his/her local.

SEC. 7.  All delegates in attendance at National, Regional, or State Conventions shall be required to wear clothing and other articles insofar as possible, bearing the union label.

**SEC. 8.  A BMC Conference in the year of the national convention will be held on the Friday immediately prior to the national convention.**

## ARTICLE 6

### REPRESENTATION

SEC. 1. (a)  Each local union and area local shall be entitled to representation in national conventions of one (1) delegate and one (1) vote for each twenty-five (25) members or fraction thereof.

(b)  Each affiliate local shall be entitled to at least one (1) delegate vote.

(c)  Each state organization shall be entitled to one (1) delegate and one (1) vote for each twenty-five (25) members or fraction thereof of the unrepresented members.

(d) Each regional organization which is organized in place of the state organization and where no state organizations exist shall be entitled to one (1) vote for each twenty-five (25) members or fraction thereof of the unrepresented members.

(e)  All local, state and regional organizations in electing their delegates to the national convention must fulfill the requirements under applicable federal laws.  National conventions credentials must be signed by the local president and/or the secretary, secretary-treasurer, or treasurer.

(f)  The Convention can, at its pleasure, give to visiting members-at-large (MAL) a vote provided not more than three (3) members-at-large attend the convention.  If more than three (3) attend, the chairman of the Credentials Committee with the consent of the convention, shall apportion one (1) vote to every three (3) members-at-large.

SEC. 2. (a)  No local, state or regional union shall be represented by proxy.

SEC. 3.  METHOD OF VOTING ON ROLL CALL.  One (1) or more delegates shall cast the full numbers of votes to which his or her Local is entitled; the voting of delegates shall precede the roll call of national officers; but no delegate shall be seated with less than one (1) full vote, except members-at-large.

SEC. 4.  Representation shall be based on the average amount of representation tax (per capita) paid monthly by each Local during the preceding fiscal year, provided, however, that any local whose charter in the APWU has not been in existence for one (1) year is entitled to representation at the convention on the average of per capita tax paid monthly since its admission.

SEC. 5.  Alternate delegates may be seated in the permanent absence of the regular delegates upon presentation of proper credentials.  Alternate delegates shall not be seated in the temporary absence of the regular delegate.

SEC. 6.  Each national officer holding an elective office shall have voice and one (1) vote and shall be a delegate to the national convention.

ARTICLE 7

GENERAL OFFICERS

SEC. 1. (a) PRESIDENT.  It shall be the duty of the President to preside at all conventions and at meetings of the National Executive Board and National Executive Council. He/she shall be a member of all committees.  He/she shall appoint the necessary committees at each convention.  He/she shall fill all vacancies from any cause whatsoever, subject to the approval by a majority of the members of the National Executive Board, until such vacancy is filled by regular election.  He/she shall be empowered to appoint the necessary staff at national headquarters and throughout the organization to carry on the necessary programs of the Union such as industrial engineers, economists, financial technicians, industrial relations technicians, public relations personnel and national organizers.  He/she shall submit to each convention a written report of his/her official acts during his/her term of office.  He/she shall sign all orders drawn by the Secretary-Treasurer and countersign all checks.  He/she shall be responsible for all work of the Union and all officers of the Union shall work under his/her supervision.  He/she shall be the editor of the official organ of the Union.  His/her salary shall be **One Hundred Twenty-Eight Thousand One Hundred Twenty-Nine and Eighty-Seven Cents ($128,129.87)** per annum, plus necessary expenses.

(b) EXECUTIVE VICE PRESIDENT.  The Executive Vice President shall perform the duties of the President in case of his/her absence or inability to attend to the duties of his/her office.  In the event of death or resignation of the President, the Executive Vice President shall replace him or her until the next called general election.  He/she shall be a member of the National Negotiations Committee and he/she shall, under the direction of the President, assist in handling Union business.  He/she shall, in the absence of the President, be authorized to sign checks.  His/her salary shall be **One Hundred Eleven Thousand Six Hundred Forty-Two Dollars and Twenty-Six Cents ($111,642.26)** per annum, plus necessary expenses.

(c) SECRETARY-TREASURER.  The Secretary-Treasurer, under the supervision of the President, shall keep a record of all proceedings, and all other records of this Union.  He/she shall be the custodian of the official seal and shall issue all charters.  He/she shall supervise the recording of the membership of each local union, along with the name and address of each member-at-large.  He/she shall see that a written report is submitted to the national convention, showing the number of locals and members and a written report of all his/her official acts during his/her term of office.  The Secretary-Treasurer shall receive and deposit all monies from all local unions and members-at-large.  He/she shall also be the official custodian of all monies of this Union.  He/she shall disburse all monies by check countersigned by the President.  He/she shall see that a written report is submitted to the national convention of all monies received and disbursed.

The Secretary-Treasurer shall submit the books of the organization to an attested public accountant at the close of each fiscal year and report of the accounting shall be verified by the Finance Committee.  Upon written request, the report of the accounting shall be sent to local presidents, along with the Secretary-Treasurer's analysis of the Union's financial position. He/she shall perform such other duties as the President may require of him or her.

The Secretary-Treasurer's salary shall be **One Hundred Eleven Thousand Six Hundred Forty-Two Dollars and Twenty-Six Cents ($111,642.26)** per annum, plus necessary expenses.

ARTICLE 8
DEPARTMENT & ADMINISTRATIVE OFFICERS

SEC. 1.  INDUSTRIAL RELATIONS DEPARTMENT.  The Industrial Relations Director shall be charged with the responsibility for the labor-management, national negotiations, mechanization, health and safety for all divisions of the Union and the administration of the contract.  His/her salary shall be **One Hundred One Thousand Seven Hundred Seventy-Two Dollars and Eight Cents ($101,772.08)** per annum, plus necessary expenses.

SEC. 2. (a) LEGISLATIVE DEPARTMENT.  The Legislative Director shall be charged with the responsibility of directing all activities of the Union with regard to legislation of interest to the members and their families.  He/she shall develop publicity programs and be the editor of the weekly news bulletin and the associate editor of the official organ of the Union.  He/she shall work in cooperation with the AFL-CIO and other national and international unions with regard to legislation.  His/her salary shall be **One Hundred One Thousand Seven Hundred Seventy-Two Dollars and Eight Cents ($101,772.08)**per annum, plus necessary expenses.

(b) Assistant Legislative Director shall assist the Legislative Director in the development of legislative programs of the APWU.  He/she shall assist the Legislative Director with the weekly news publication and assist in the development of publicity programs of the APWU. His/her salary shall be **Ninety-Five Thousand One Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73)** per annum, plus necessary expenses.

SEC. 3.  ORGANIZATION DEPARTMENT.  The Organization Director shall direct and be responsible for maintaining and/or increasing the membership in this Union and direct the organization of the unorganized.

He/she shall promote and encourage and advise membership committees in all phases of membership recruitment programs.  Current brochures and material shall be prepared and maintained by him/her.  The organizing material shall appeal to membership of all divisions under the jurisdiction of the APWU.  His/her salary shall be **Ninety-Five Thousand One**

**Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73)** per annum, plus necessary expenses.

SEC. 4.  RESEARCH AND EDUCATION DEPARTMENT.  The Research and Education Director shall be charged with the responsibility of conducting research and administering educational programs at the national, regional, state, area and local levels.  Education shall be a mandatory part of the business of the APWU, particularly education in labor history, labor problems, grievance procedure, the objectives of the APWU and the problems of the APWU, its members and their families.

There shall be established educational areas throughout the fifteen (15) regions to which educational representatives shall be assigned.  These educational representatives shall be appointed by the President to work under the direction of the Research and Education Director and such appointments shall be approved by the National Business Agent(s) in whose area they shall serve.  His/her salary shall be **Ninety-Five Thousand One Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73)** per annum, plus necessary expenses.

SEC. 5.  HEALTH PLAN DEPARTMENT.  The APWU shall have a Health Plan Director.  This officer shall serve on the Board of Directors for the APWU Health Plan and shall work under the direction of the President.  His/her salary shall be **One Hundred One Thousand Seven Hundred Seventy-Two Dollars and Eight Cents ($101,772.08)** per annum, plus necessary expenses. Such salary shall come from the premiums of the APWU Health Plan.

SEC. 6. (a)  HUMAN RELATIONS DEPARTMENT.  The Human Relations Director shall prepare and direct programs in the area of equal opportunity civic programs, community service programs, retirement programs and all other related programs.  His/her salary shall be **Ninety-Five Thousand One Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73)** per annum, plus necessary expenses.

(b)  The President shall appoint one (1) representative residing and working within each OWCP district to handle, on an "as-needed" basis, such claims as may arise.  Such Representatives will be under the administrative control of their respective Regional Coordinators but will be credited to and against the staffing and budget of the Human Relations Department.  Each Regional Coordinator may, if necessary, appoint, subject to approval of the President, one (1) representative to handle such EE0 cases as may arise on an "as-needed" basis.  These representatives will be under the administrative control of their respective Regional Coordinators but will be credited to and against the staffing and budget of the Human Relations Department.  Such representatives will be reimbursed for expenses and lost time only.

SEC. 7.  REGIONAL COORDINATORS.  There shall be five (5) Regional Coordinators, to be elected from their respective regions.  The Regional Coordinators shall operate under the direction of the President.  The Regional Coordinators shall be members of the National

Executive Board.  Their salary shall be **Eighty-Three Thousand Nine Hundred Fifty-Three Dollars and Twenty-Eight Cents ($83,953.28)** per annum, plus necessary expenses.

SEC. 8.  CARIBBEAN AREA NATIONAL BUSINESS AGENT.  There shall be an elected National Business Agent who shall serve all APWU represented employees in all divisions for the Caribbean Area and shall be eligible to participate as a National Business Agent in all official meetings of the Division Councils, excluding the filling of vacancies in Article 18.  His/her salary shall be **Seventy-Five Thousand Three Hundred Sixty-Seven Dollars and Ninety-Nine Cents ($75,367.99)** per annum, plus necessary expenses.

SEC. 9 ALASKAN AREA NATIONAL BUSINESS AGENT.  There shall be an elected National Business Agent who shall serve all APWU represented employees in all divisions within the state of Alaska on an "as-needed" basis and shall be eligible to participate as a National Business Agent in all official meetings of the Division Councils, excluding the filling of vacancies in Article 18.  His/her salary shall be **Seventy-Five Thousand Three Hundred Sixty-Seven Dollars and Ninety-Nine Cents ($75,367.99)** per annum, plus necessary expenses. This salary shall be paid to this officer only when performing the duties of this position.

SEC. 10. PACIFIC AREA NATIONAL BUSINESS AGENT.  There shall be an elected National Business Agent who shall serve all APWU represented employees in all divisions within the Pacific Area and shall be eligible to participate as a National Business Agent in all official meetings of the Division Councils, excluding the filling of vacancies in Article 18.  His/her salary shall be **Seventy-Five Thousand Three Hundred Sixty-Seven Dollars and Ninety-Nine Cents ($75,367.99)** per annum, plus necessary expenses.

ARTICLE 9

DIVISION OFFICERS

SEC. 1.  CLERK DIVISION.  (a) Director:  The Director of the Clerk Division shall be responsible for the Division.  He/she shall also be responsible for processing all grievances in the division.  He/she shall be a member of the Labor-Management Committee and National Negotiating Team.  His/her salary shall be **One Hundred One Thousand Seven Hundred Seventy-Two Dollars and Eight Cents ($101,772.08))** per annum, plus necessary expenses.

(b) Assistant Director (A):  The Assistant Director shall assist the Director of the Clerk Division in handling of grievances and such other duties that may be assigned to him/her. His/her salary shall be **Ninety-Five Thousand One Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73)** per annum, plus necessary expenses.

(c) Assistant Director (B):  The Assistant Director shall assist the Director of the Clerk Division in handling of grievances and such other duties that may be assigned to him/her.

His/her salary shall be **Ninety-Five Thousand One Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73)** per annum, plus necessary expenses.

(d) Assistant Director (C):  The Assistant Director shall assist the Director of the Clerk Division in handling of grievances and such other duties that may be assigned to him/her. His/her salary shall be **Ninety-Five Thousand One Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73)** per annum, plus necessary expenses.

(e) National Business Agents:  The forty (40) National Business Agents shall serve as field representatives in their assigned regions or in any place that the President so directs. Under the Division Director's supervision, they shall have jurisdiction over grievances and organization matters within their assigned region.  Their salary shall be **Seventy-Five Thousand Three Hundred Sixty-Seven Dollars and Ninety-Nine Cents ($75,367.99)** per annum, plus necessary expenses.

(f)  The forty (40) National Business Agents of the Clerk Division shall be listed according to seniority as national officers.

(g)  National Organizers:  The APWU Organization reserves the right to select representatives to be known as National Organizers who will primarily be used in organizing and public relations work under the direction of the National Business Agent.  They shall be appointed by the President for the term of one year (1) commencing October 1 of each year. Their lost time and actual expenses will be paid out of the National Treasury.

(h)  The National Clerk Division Council shall be comprised of the Division Director, the three (3) Assistant Directors, the National Business Agents and National Organizers.

SEC. 2.  MOTOR VEHICLE SERVICE (MVS) DIVISION.   (a) Director: He/she shall be charged with the responsibility of handling all problems and grievances pertaining to MVS. He/she shall be a member of the Labor-Management Committee and National Negotiating Team.  His/her salary shall be **Ninety-Five Thousand One Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73)** per annum, plus necessary expenses.

(b) Assistant Director:  He/she shall be charged with the responsibility of maintaining all records of the MVS membership.  He/she shall assist the Director of the MVS Division in grievances and other organizational problems.  His/her salary shall be **Eighty-Eight Thousand Five Hundred Fifty-Nine Dollars and Seventy-Six Cents ($88,559.76)** per annum, plus necessary expenses.

(c)  National Business Agents:  There shall be six (6)  National Business Agents, one (1) in the Southwest Sub-Region (Arkansas, Kansas, Louisiana, Missouri, Nebraska, Oklahoma and Texas), one (1) in the Southeast Sub-Region (Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina and Tennessee) and one (1) each in the Central **(Illinois, Indiana, Iowa, Kentucky, Michigan, Minnesota, North Dakota, Ohio, South Dakota and Wisconsin)**, Eastern, Northeast and Western  postal regions.  They shall be charged with the responsibility

of handling problems, grievances, and such other duties as may be assigned to them by the Director of the MVS Division.  Their salary shall be **Seventy-Five Thousand Three Hundred Sixty-Seven Dollars and Ninety-Nine Cents ($75,367.99)** per annum, plus necessary expenses.

(d)   The National Motor Vehicle Service Division Council shall be comprised of the Division Director, Assistant Director, and the National Business Agents.

SEC. 3.   MAINTENANCE DIVISION. (a) Director:   The Director of the Maintenance Division shall be charged with the responsibility of the operation and have authority concerning Maintenance employees.  He/she shall be a member of the National Negotiating Team, National Mechanization Committee and Labor-Management Committee.  His/her salary shall be **Ninety-Five Thousand One Hundred Fifty-Two Dollars and Seventy-Three Cents ($95,152.73))** per annum, plus necessary expenses.

(b) Assistant Director (A):   The Assistant Director (A) shall assist the Director of the Maintenance Division in the handling of grievances and such other duties that may be assigned to him/her.  His/her salary shall be **Eighty-Eight Thousand Five Hundred Fifty-Nine Dollars and Seventy-Six Cents ($88,559.76)** per annum, plus necessary expenses.

(c) Assistant Director (B):   The Assistant Director (B) shall assist the Director of the Maintenance Division in the handling of grievances and such other duties that may be assigned to him/her.  His/her salary shall be **Eighty-Eight Thousand Five Hundred Fifty-Nine Dollars and Seventy-Six Cents ($88,559.76))** per annum, plus necessary expenses.

(d) National Representative-at-Large:   The National Representative-at-Large shall assist officers in the field of grievances, organizational activities and general union business.  He/she will assume the duties of the BMC Coordinator.  His/her duties shall include that (a) he or she shall direct inquiries or special problems at the Bulk Mail Centers (BMC) to the national officers for resolution and/or immediate response; and (b) he or she shall coordinate and co-chair the BMC meeting**s** with the host local; and (c) shall provide written response to specific problems within sixty (60) days.  His/her salary shall be **Eighty-Eight Thousand Five Hundred Fifty-Nine Dollars and Seventy-Six Cents ($88,559.76)** per annum, plus necessary expenses.

(e) National Business Agents:   There shall be nine (9) National Business Agents of the Maintenance Division, two (2) in the Western and Southern postal regions and one (1) each in the Eastern and  Northeast postal regions and one (1) each in Central Sub-Region A (Illinois, Indiana, Kentucky and Ohio), Central Sub-Region B (Iowa, Kansas, Missouri and Nebraska) and Central Sub-Region C (Michigan, Minnesota, North Dakota, South Dakota and Wisconsin); and they shall be elected by mail ballots, restricted to membership of the respective region or sub-region.  Their salary shall be **Seventy-Five Thousand Three Hundred Sixty-Seven Dollars and Ninety-Nine Cents ($75,367.99)** per annum, plus lost time and necessary expenses.

(f)    The National Maintenance Division Council shall be comprised of the Division Director, the Assistant Directors, National Representative-at-Large, and the National Business Agents.

SEC. 4.   SUPPORT SERVICES DIVISION.   (a)   The Division shall be comprised of members from information service centers, mail transport equipment service centers, mail equipment shops, material distributions centers, operating service facilities, mail transport operations, other non-mail processing facilities or operations, and related operations in the private sector with the right to ratify respective agreements.

(b)  National Business Agent: There shall be a National Business Agent.  This National Business Agent shall be charged with the responsibility of grievances and other organization matters and other issues relating to the division.   He/she shall be a member of the Labor-Management Committee and the National Negotiating Team.  His/her salary shall be **Seventy-Five Thousand Three Hundred Sixty-Seven Dollars and Ninety-Nine Cents ($75,367.99)** per annum, plus expenses.

SEC. 5.   Mail Handler Division:  The appointment of a Mail Handler Representative for each of the five (5) regions will be utilized, as needed.

SEC. 6.   All Division Officers shall be responsible to and work under the direction of the Division Director of their respective divisions.

SEC. 7.   Nationally appointed advocates shall be paid for lost hours based on the salary of **Fifty-Seven Thousand Eight Hundred Four Dollars and Six Cents ($57,804.06) and Twenty-Seven Dollars and Seventy-Nine ($27.79)** per hour, and that they be given future pay increases in the same manner as national officers.

SEC. 8.   All divisions will be established on a departmental basis within the structure of the APWU.  Each division department shall be headed by its own director and other necessary officers, who shall be members of the particular division and shall be elected only by members of that division.  This administrative structure is to apply similarly in the organization of local, area, state and regional unions affiliated with the APWU wherever feasible.


ARTICLE 10

ELIGIBILITY TO RUN AND HOLD NATIONAL,

STATE, OR LOCAL OFFICE


SEC.1 Eligibility for Office.   To be eligible for nomination, the candidate must be a member in good standing.

(b) No member holding office in any other organization representing employees for the purposes of collective bargaining or in administrative proceedings can be elected or appointed as an officer of the APWU, nor can he/she be seated as a delegate to the national convention.

SEC. 2 (a)   Any National Officer making application, in writing, for a position of management shall within ten (10) days of that application resign his/her position with the APWU and if such resignation is not forthcoming, the National Executive Board shall, upon conclusive evidence, declare said office vacant and appoint a successor.

(b)   Any employee eligible to be a member of the American Postal Workers Union who voluntarily holds a managerial, supervisory or EAS position with responsibility for issuing or recommending discipline, or applying or interpreting the National Agreement for the equivalent of a two-week period in a year shall be ineligible to hold office at any level of the APWU or to be a delegate to any convention held by the APWU or any subordinate body of the APWU, so long as the employee continues to serve in such position and for a period of one (1) year from the time the employee vacates such position.

Any member who has submitted an application to a managerial, supervisory, or EAS position with responsibility for issuing or recommending discipline or for applying or interpreting the National Agreement shall withdraw such application prior to acceptance of nomination for any office in the APWU.

(c)   Any member  who voluntarily, after August 31, 1984, holds, accepts or applies for any managerial or supervisory position, EAS position or the PASS Program or any other supervisory program,  for any period of time, whether one (1) day or a fraction thereof, either detailed, acting, probationary or permanently after being elected or appointed to any office, shall immediately vacate any office held by that member in the national, local, area local, district council, state or regional organization, any department of the APWU, the Postal Press Association, or any subordinate body of the APWU which receives financial support or uses the name of the American Postal Workers Union.


## ARTICLE 11
## NOMINATIONS


SEC. 1.  The officers of this Union shall be elected by secret ballot by plurality vote and shall consist of President, Executive Vice President, Secretary-Treasurer, Industrial Relations Director, Legislative Director, Assistant Legislative Director, Organization Director, Research and Education Director, Health Plan Director, Human Relations Director, and five (5) Regional Coordinators (One for Central, Eastern, Northeast, Southern and Western).  Where there is more than one (1) National Business Agent within a region, they will be referred to as National Business Agent (A), (B), (C), (D), etc.

CLERK DIVISION:  Director, three (3) Assistant Directors who will be referred to as Assistant Director (A), (B) and (C), and forty (40) National Business Agents (refer to chart for complete breakdown into regions).

MOTOR VEHICLE SERVICE DIVISION:  Director, Assistant Director and six (6) National Business Agents (refer to chart for complete breakdown into regions).

MAINTENANCE DIVISION:  Director, two (2) Assistant Directors who will be referred to as Assistant Director (A) and (B), National Representative-At-Large and nine (9) National Business Agents (refer to chart for complete breakdown into regions ).

SUPPORT SERVICES DIVISION:  National Business Agent

National Business Agent, Caribbean Area
National Business Agent, Alaskan Area, "as-needed"
National Business Agent, Pacific Area

| CHART FOR NATIONAL BUSINESS AGENTS (NBA) | | | | | |
|---|---|---|---|---|---|
| | Clerk | Maintenance | MVS | Support Services | Other |
| **CENTRAL REGION** | | | 1<br><br>**(covers IL, IN, IA, KY, MI, MN, ND, OH, SD, WI)** | | |
| Region:<br>　　　Chicago | 3 | | | | |
| 　　　Cincinnati | 3 | | | | |
| 　　　Minneapolis | 2 | | | | |
| 　　　St. Louis | 2 | | | | |
| 　　　Wichita | 2 | | | | |
| Sub-Region:<br>　A　(IL,IN,KY,OH) | | 1 | | | |
| 　B　(IA,KS,MO,NE) | | 1 | | | |
| 　C　(MI,MN,ND,SD,WI) | | 1( | | | |
| **EASTERN REGION** | | 1 | 1 | | |
| Region:<br>　　　Philadelphia | 3 | | | | |
| 　　　Washington, DC | 3 | | | | |
| **NORTHEAST REGION** | | 1 | 1 | | 1<br>(Caribbean Area) |
| Region:<br>　　　New England | 3 | | | | |
| 　　　New York | 3 | | | | |
| **SOUTHERN REGION** | | 2 | | | |
| Region:<br>　　　Atlanta | 3 | | | | |
| 　　　Dallas | 3 | | | | |
| 　　　Memphis | 2 | | | | |
| Sub-Region: Southwest (AR,KS,LA,MO,NE,OK,TX) | | | 1 | | |
| Sub-Region: Southeast (AL,FL,GA,MS,NC,SC,TN) | | | 1 | | |
| **WESTERN REGION** | | 2 | 1 | | 2<br>(Pacific & Alaskan Areas) |
| Region:<br>　　　San Francisco | 4 | | | | |
| 　　　Denver | 2 | | | | |
| 　　　Northwest | 2 | | | | |
| ALL REGIONS | | | | 1 | |

m

　　　SEC. 2. (a)  CANDIDATES FOR NATIONAL RESIDENT OFFICES.  Any member in good standing in this Union may be a candidate for election, if eligible, provided he/she has nominating petitions endorsed by at least a total of twelve (12) locals, representing at least five (5) states in three (3) or more regions.

　　　(b)  Candidates for Regional Coordinator must be members-at-,large or members in good standing of a local in the region he/she seeks to represent and must have nominating

petitions endorsed by at least ten (10) locals representing at least four (4) states within the Region.

(c)   Candidates for any division position must be members of the division in which they seek such positions and they are to be elected only by members of that division.

(d)   Candidates for National Business Agent, Clerk Division must be members-at-large or members in good standing of a local in the region he/she seeks to represent and endorsed by at least eight (8) locals within that region.

(e)   Candidates for National Resident Offices, Motor Vehicle Service and Maintenance Divisions shall have their nominating petitions endorsed by twelve (12) locals from five (5) states.

(f)   Candidates for National Business Agent, Maintenance Division shall have their nominating petitions endorsed by division members representing at least ten (10) locals in at least four (4) states within their region.

(g)   Candidates for National Business Agent, Motor Vehicle Service Division shall have their petitions endorsed by division members from eight (8) different locals within their region.

(h)   Candidates for the National Business Agent, Caribbean Area shall be members-at-large or members in good standing and must be residents of the Caribbean Area.  Petitions are to be signed by the local president and secretary.

(i)   Candidates for the National Business Agent, Alaskan Area must be members-at-large or members in good standing and must be residents of the state of Alaska.  Petitions are to be signed by the local president and secretary.

(j)   Candidates for the National Business Agent, Support Services Division must be members-at-large or members in good standing and must work in one of the facilities of the Support Services Division and shall have their nominating petitions endorsed by at least three (3) Support Services Facilities.  Petitions are to be signed by the local president and secretary.

(k)   Candidates for the National Business Agent, Pacific Area must be members-at-large or members in good standing and must work within the Pacific Area.  Petitions are to be signed by the local president and secretary.

(l)   Petitions from Caribbean Area, Alaskan Area and Pacific Area must have at least one (1) petition signed by one local from their respective region.

(m)   Candidates for Retiree National Convention Delegate must be members in good standing of the APWU Retirees Department, paying Twenty-Four ($24.00) Dollars per year per capita tax to the National Union.  A member of the APWU Retirees Department in good standing may request a nominating petition and may nominate himself or herself or any other member in good standing of the APWU Retirees Department to be a candidate for Retiree National Convention Delegate for the region that he/she will represent, and he/she will be elected from that region.   Members in good standing who are nominated by others and are not self-

nominated, will be notified that they have been so nominated and must agree in writing to accept the nomination before their names can be placed on the ballot.

SEC. 3.   (a)   Any eligible member may secure an official petition from the Secretary-Treasurer on May 1 through June 1 of the election year.   Such petitions will be duplicated by each candidate at his/her own expense and must be received no later than **June 15** at 5 p.m. at a box designated by the Secretary-Treasurer.   Candidates shall provide in such petitions a certification signed by them, stating:  "I am a member in good standing of the **_____** Division." "I am employed by **_____**."  "The title of my job is **_____**"  "I am retired:  **_____**"  "I am not retired:  **_____**".   Candidates for Retiree National Convention Delegate shall certify that they are members in good standing of the APWU Retirees Department and are not employed by the United States Postal Service.

(b)   The Secretary-Treasurer shall, after certifying the constitutional qualifications of each candidate, publish in the August issue of the official organ, the names of all candidates for National Office**,** and for Retiree National Convention Delegate.   In the event that only one (1) eligible candidate is nominated for an office, the Secretary-Treasurer shall cast one (1) ballot for each nominee whereupon the Election Committee shall declare the nominee(s) duly elected to the respective position.

(c)   The Editor of the APWU official organ shall print in the August issue articles contributed by candidates for contested positions, not to exceed three hundred (300) words and all such articles shall be submitted, by certified mail, and received by the Secretary-Treasurer, not later than July 1 to be valid for printing.

(d)   In the event of the death of a nominee for any office or Retiree National Convention Delegate, the National Executive Board shall be empowered, in its own discretion, to take such action consistent with federal laws as it deems necessary, including but not limited to, the holding of new nominations and election for the affected office(s).

SEC. 4.  Any APWU member seeking election to a Health Plan national office must be a member in good standing (if eligible) of the APWU Health Plan in order to be declared an "official candidate."


ARTICLE 12

ELECTION PROCESS

SEC. 1.  An Election Committee shall be appointed by the President and shall consist of not less than five (5) members and shall submit a full report of the election returns to the President immediately after the tally has been completed, but not later than November 1st. Their lost time and expenses shall be paid for by the APWU.  Any candidate may have a right to witness the tabulation at his/her own expense.   The Election Committee shall promulgate

reasonable rules and regulations governing the conduct of all national elections.  Such rules and regulations shall be consistent with the National Constitution and all applicable federal laws.  A copy of these rules shall be printed in the April issue of the official APWU organ.

SEC. 2.  The President shall select a recognized outside ballot association to conduct the election under the supervision of the Election Committee.  No later than September 15 of an election year, the selected outside ballot association shall mail ballots to each member in good standing at their last-known address.  Notice shall be enclosed with the ballot advising the member of the deadline by which the ballot must be received by the Election Committee in order to be counted.  The deadline for receipt of ballots from members in good standing shall be no less than twenty (20) days from the date on which the ballot association mailed ballots to members in good standing.  To be eligible to vote, a member must be in good standing according to the official records of the National Union on **June 15** of the election year.  It shall be the duty of the Secretary-Treasurer to furnish the ballot association with a mailing list early enough so that ballots will be mailed out during the period September 10 through September 15 of an election year.  No other matter shall be enclosed in either the outer envelope or the ballot envelope, except the printed information.

SEC. 3.  The member voting shall indicate his/her choice for each of the candidates names by making a cross (X) or check ( ) opposite the name of the candidate for whom he/she wishes to vote.  The voter shall then seal his/her ballot in the small envelope, without any writing, or other means of identification upon it, and enclose this envelope in the larger one and complete the address in accordance with the instructions enclosed with the ballot.

SEC. 4. (a)  Write-in votes shall not be valid, counted or considered.  Any unopposed candidate duly-qualified by nominating petition for office or Retiree National Convention Delegate, after nomination petitions have been closed, shall be declared elected, and his/her name shall not appear on the ballot.

(b)  Members may not file or be candidates for more than one (1) elective office.

SEC. 5.  Ballots to be valid shall be in the designated Box not later than 2 p.m., October 5.  They shall be taken from the designated box at or about 2 p.m., October 5th by the ballot association with at least two (2) members of the Election Committee

being present.  In the event October 5th falls on a Saturday, Sunday, or holiday, the time shall be extended to the next weekday.  The Chairperson of the Election Committee shall be responsible for having printed tally sheets properly prepared, showing the votes cast by each local.  Tally sheets for Retiree National Convention Delegate shall show the total votes cast.  Counting ballots must be completed by November 1.

SEC. 6.  The ballots shall be counted in the presence of no less than three (3) members of the Election Committee.  The candidate or candidates receiving the highest number of votes for each office shall be declared elected.  In the case of a tie affecting the final selection of one

(1) or more candidates, only the names of the tied candidates shall be re-submitted to the Election Committee who shall prepare a ballot and conduct another election. After certification of the election results, signed by members of the Election Committee, it shall be the duty of the Secretary-Treasurer to announce the results of the election in the next edition of the official organ.

SEC. 7.  National Officers and Retiree National Convention Delegates shall be elected by mail ballot of the members for a three (3) year period, effective November 1 of the election year.

Newly-elected officers shall report and take office on November 12 of the election year, and outgoing officers shall remain on the job in an advisory capacity for a period of five (5) working days, in order to effectuate a smooth transition of officers.

SEC. 8.  Each local union, area local, regional and state organization shall establish an election committee, no member of which shall be a candidate for election while serving on such committee.  The election committee shall be responsible for the conduct of local elections and shall decide all controversies arising out of the election processes.  Any member who feels aggrieved in connection with the conduct of a local, state or regional election shall file his/her grievance with the election committee within seventy-two (72) hours after his/her grievance arises.  (For the purpose of this Article, the term "election" shall include nominating procedures.)

Appeals from the decision of the election committee shall be to the National Election Appeals Committee described in Section 9 of this Article; shall be in writing; shall set forth all the relevant facts on which the appeal is based; and shall be filed with the National Election Appeals Committee within five (5) days from receipt of the decision of the affiliate's election committee.

SEC. 9.  Any member who feels aggrieved in connection with the conduct of a national election shall file his/her grievance with the National Election Appeals Committee within seventy-two (72) hours after his/her grievance arises.

SEC. 10.  The President of the APWU, with the approval of the National Executive Board, shall appoint a National Election Appeals Committee which shall consist of the President and four (4) additional members.  This Committee shall have final authority to decide disputes, controversies and appeals arising out of local, state, regional and national elections.  The National Election Appeals Committee shall have authority to adopt rules and regulations as it deems desirable to promptly accomplish the objective of this Article.  Where the National Elections Appeals Committee finds merit in an appeal, it shall have full authority to direct and impose such a remedy as it considers necessary or proper.

SEC. 11.  Officers, declared elected through applicable procedures of national, local, area local, regional and state organizations, shall assume and hold office pending final determination, under the appeals procedures provided in this Article.

ARTICLE 13

NATIONAL EXECUTIVE BOARD, EXECUTIVE COUNCIL, AND COMMITTEES

SEC. 1.   The National Executive Board of the APWU shall consist of the President, Executive Vice President, Secretary-Treasurer, Industrial Relations Director, Clerk Division Director, Motor Vehicle Service Division Director, Maintenance Division Director, and the five (5) Regional Coordinators.

The National Executive Board shall be the highest-ranking governing body of the American Postal Workers Union, AFL-CIO, in between conventions and shall meet at least once a calendar year and/or at the call of the President.

Furthermore, a majority of the members of the National Executive Board, upon written request, shall have the power to call a special meeting of the National Executive Board.

The National Executive Board of the APWU and the Director of the Health Plan shall be the Board of Directors of the Health Plan.

SEC. 2.   NATIONAL EXECUTIVE COUNCIL:   The National Executive Council shall be comprised of the National Executive Board, all Division Councils, and all other full-time national officers.

SEC. 3.   The delegates of the American Postal Workers Union to the AFL-CIO convention shall be the President, Secretary-Treasurer, Legislative Director, Research and Education Director and Human Relations Director.   If, for any reason, any of the foregoing are unable to attend the AFL-CIO Convention, the President shall appoint an alternate delegate or delegates.   Delegates shall attend the sessions of the AFL-CIO convention and properly represent this organization, guided by instructions of the APWU and the National Executive Board.

SEC. 4.   ELIGIBILITY TO COMMITTEES:   No person shall be eligible for membership on any Committee unless he/she is a member in good standing of the APWU.

SEC. 5.   There shall be a standing Constitution Committee of seven (7) members, including division representation, appointed by the President.   The Committee shall review the Constitution and Bylaws of all of its subordinate bodies to determine their compliance with existing labor laws and the provisions of the Constitution and Bylaws of the APWU.   The Constitution Committee shall convene at the call of the President.

SEC. 6.   FINANCE COMMITTEE:   At least one (1) month in advance of the national convention, the President shall request the presidents of three (3) local unions to designate a delegate elected from their respective unions to serve as a member of the Finance Committee. Upon receipt of notice of selection of three (3) members for the Finance Committee, the President shall notify them of their appointment and designate a date on which they will report to

national headquarters.  The Finance Committee shall review and verify the audit of the books and accounts of the Secretary-Treasurer.  The Finance Committee shall check, review and approve the bonds of the national officers and make a report of their findings.  Their report shall be printed with the Report of Officers and submitted to the national convention.  Their necessary expenses incurred in the performance of their duties shall be paid from the national treasury.

SEC. 7.   There will be established a Women's Committee which should be known as APWU POWER (Post Office Women for Equal Rights).

SEC. 8.   There will be established a Deaf/Hard of Hearing Task Force Committee.

SEC. 9.   RANK AND FILE BARGAINING ADVISORY COMMITTEE AND CONTRACT RATIFICATION.

(a)  Each member of the National Executive Board shall appoint one (1) member who is not on the national payroll to serve on the Rank and File Bargaining Advisory Committee.

**No fewer than one (1) member from the Deaf and Hard of Hearing Task Force shall be an automatic member of the Rank and File Bargaining Advisory Committee during National negotiations of our Collective Bargaining Agreement.**

The purpose of the committee shall be to recommend and advise the National Negotiating Team on bargaining demands.  It shall be convened on the call of the President not less than sixty (60) days prior to the submission of the proposed contract demands and at such other time(s) as the President might deem necessary to keep the Committee adequately informed on the progress of the negotiations, but specifically when any tentative agreement has been reached.

(b)   The National Negotiating Team has full authority to negotiate the terms of any collective bargaining agreement with an employer with respect to grievances, labor disputes, rates of pay, wages, fringe benefits, and hours of employment or conditions of work, subject to the following:

(1)  The Rank and File Bargaining Advisory Committee be given full veto power over the proposed National Agreement.

(2)   If a majority of the voting members of the Committee vote against acceptance of the proposed agreement, the contract will not be sent out on a referendum and shall be considered a mandate to the National Negotiating Team to reopen negotiations.

(c)  The National Rank and File Bargaining Advisory Committee, upon their approval of the tentative agreement, shall determine the conduct of the membership ratification vote by mail, providing the envelopes in this referendum are exactly the same in all physical characteristics and destinations and provided that the envelopes are private, without a window. They shall select from among their members a subcommittee of five (5) to supervise the counting of the ballots.

Any National Agreement brought to the membership for ratification vote will contain sufficient details for the membership to make an informed decision prior to any ratification vote.

## ARTICLE 14
## RECALL

There shall be no recall provision in this Constitution and Bylaws, or in the Constitution or Bylaws of any APWU subordinate body.  Removal of officers is governed by Article 15.

## ARTICLE 15
## LOCAL AND MEMBERSHIP PROTECTION

The following shall constitute offenses, the commission of which shall subject any officer or member of the American Postal Workers Union, or of any subordinate body of APWU, or a subordinate body itself, to disciplinary action as set forth herein:

SEC. 1. (a)  Violating any provision of the Constitution or Bylaws of the APWU or of a subordinate body, or failure to perform duties or functions specified or required therein;

(b)  Engaging in a movement which has for its purpose the fostering of a rival organization;

(c)  Violating the right of members to be free from discrimination on the basis of race, color, creed, sex, sexual orientation, nationality, handicap, political affiliation, age, or religion;

(d)  Engaging in conduct that would expose the APWU to civil liability;

(e)  Joining or lending active support to any organization or movement, whose purposes and objectives are contrary to the fundamental principles of the government of the United States of America, such as a communist or fascist movement.

(f)  An officer or member or subordinate body found guilty of any of the foregoing after the filing of charges and the holding of hearings and other procedures as prescribed in this Article, may be disciplined by probation, suspension, expulsion, or other appropriate disciplinary action.

SEC. 2. (a)  Except in case of suspension or expulsion for non-payment of dues or per capita, the President may initiate suspension proceedings against a subordinate body upon a finding of:  (1) a willful and substantial commission of an offense prohibited by Section 1 of this Article, and may suspend a subordinate body upon a finding; (2) that such suspension is necessary to prevent the theft, misappropriation, or embezzlement of the funds, assets or

properties of the subordinate body.  Any such finding and suspension shall be made, in writing, setting forth the basis therefor, and shall be effective upon  delivery to the subordinate body.

(b)  Where a subordinate body is suspended under Section 2(a)(2) above, the President may appoint a trustee immediately to assume management of the affairs and business of the subordinate body.

Where suspension proceedings have been initiated against a subordinate body under Section 2(a)(1), the trustee shall not be appointed until charges are sustained by the trial board and affirmed by the National Executive Board.

(c)    The Secretary-Treasurer shall serve specific charges in writing upon such subordinate body as promptly as possible [but not later than five (5) days after its suspension or the appointment of a trustee under Section 2(a)(2)], and a trial of such charges shall take place within thirty (30) days thereafter before a trial board appointed by the National Executive Board. The trial board shall consist of three (3) members, who shall not be interested in the matter out of which the charges arose.  The accused shall have the right to counsel, to produce evidence, to cross-examine, and to a stenographic transcript of all the testimony.  The decision of the trial board shall be rendered within ten (10) days following the trial, and shall direct either that suspension under Section 2(a)(1) be or not be imposed, or as to proceedings under Section 2(a)(2) that the suspension continue in effect for a specified period of time, or that the suspension be terminated.

(d)  An adverse decision of the trial board may be appealed by the subordinate body, its Secretary-Treasurer, or an officer thereof, to the National Executive Board by transmitting a notice of an appeal to the Board within ten (10) days following the decision of the trial board. The National Executive Board shall render its decision on the appeal, in writing, within fifteen (15) days of the receipt of the notice of appeal.  A subordinate body whose suspension is upheld by the National Executive Board may appeal to the next national convention.

(e)  A trustee appointed under this article shall have the right, upon demand, to all the funds, properties, books and assets of the suspended organization for the period that he/she is in charge, such properties to be held in trust for the benefit of the subordinate body and to be expended only to the extent necessary for the proper conduct of the affairs of the subordinate body.  The trustee shall be adequately bonded.  The trustee, so appointed, shall be authorized and empowered to suspend any or all the officers from office, but not from membership, and appoint temporary officers for the duration of his/her trusteeship, and to take such other actions as in his/her judgment are necessary for the preservation of the subordinate body, all subject to the direction, instructions and approval of the National Executive Board.  Any officer who may be suspended by the trustee under the provisions of this section shall surrender to him/her, upon proper receipt therefor, all monies, books, and properties of the subordinate body. Temporarily appointed officers shall be appointed from members in good standing of such

subordinate body.  The trustee shall be empowered to pay all claims which are properly approved if funds therefore are available, and in all necessary particulars to conduct the affairs and management of the subordinate body with the assistance of the temporary officers herein provided for until the trusteeship is terminated.  Expenses, including salaries, but not exceeding the current costs of administration of the affairs of the subordinate body, which are assumed by such trustee, shall be paid out of the funds of the subordinate body, if they are available; otherwise they shall be borne by the National Union.

(f)  A trusteeship shall be continued no longer than is necessary to coordinate and reorganize the affairs of the subordinate body and shall in all events be concluded as soon as practicable within the judgment of the President; provided, however, that the suspended subordinate body shall have the right to appeal to the National Executive Board for removal of the trusteeship if it is deemed that such trusteeship has been continued longer than is necessary; provided further, however, that no such appeal shall be made at an interval of less than ninety (90) days.  In connection with any such appeal, the subordinate body shall have the right to full hearing on the question of whether the trusteeship shall be continued.  In no event shall a trusteeship be continued for a period longer than outlined by the U.S. Department of Labor which is presently established as eighteen (18) months.

SEC. 3.  (a)  The National Executive Board of this Union shall have jurisdiction to hear and determine any and all charges under this Article or the Constitution.

(b)  The Executive Boards or trial boards of local unions or other subordinate bodies have jurisdiction only to hear charges against members or officers of such subordinate body.  In cases where charges involving members or officers of a subordinate body are presented to the National Executive Board, it shall refer such charges to the subordinate body involved **for a hearing.**

(c)  **MEMBER CHARGES.  A charge(s) by a member(s) in good standing that a member(s) has violated the APWU National Constitution or Bylaws or the Constitution or Bylaws of a Local, State or Regional Organization must be specifically set forth in writing and signed by the member(s) making the charge(s).  For each alleged offense, the charge shall state (1) who is being charged; (2) the exact nature of the alleged offense; (3) the period of time during which the alleged offense took place and (4) the constitutional provision allegedly violated.  Attached to the charge(s) will be evidence and/or, if there are witnesses, a signed statement from at least one (1) witness.**

(d**)** Except in cases of suspension or expulsion for non-payment of dues or per capita, no disciplinary action shall be taken for violation of any of the provisions of this Article or of the Constitution until an accused individual or a subordinate body has been accorded the following procedures.

(e)  Proceedings under this Article may be initiated by any member of APWU by filing charges with the secretary of the body of which the accused is an officer or member.

**(f)  PROCEDURES.  Charges must be submitted to the Secretary-Treasurer or Treasurer, or, if the Secretary-Treasurer and Treasurer are charged, then to the highest-ranking officer not charged, of the local, state or regional organization, of which the charged member(s) or officer(s) is a member, with the exception of National Officers. Charges against national officer(s) are to be submitted to the APWU National Secretary-Treasurer, or the highest-ranking officer not charged.  All charges are to be submitted within one hundred twenty (120) days of the time the charging party(ies) first became aware, or reasonably should have been aware, of the alleged offense(s).  Upon receipt of the charges, the secretary-treasurer or treasurer of the local, state, or regional organization or highest-ranking officer not charged with whom such charges are filed shall promptly transmit by express mail or certified mail, including a return receipt, a copy of the charges to the charged and charging parties at the last known address of each.**  Accompanying the charges shall be written notice of the time and place of the hearing, which shall be held not less than one (1) week after the date of mailing of the notice.  In the event of a trial board being appointed pursuant to Section (i), such notice of hearing shall be given to the accused by the committee.

(g)  The accused shall be accorded a full and impartial trial, with the right to appear personally and be represented by any member of this Union, but whether the accused shall be represented by an attorney in such trial shall be left to his/her own discretion.

(h)  Hearing may be held on a charge notwithstanding the failure of the accused, after being given notice thereof pursuant to provisions of this Article, to appear thereat.

(i) The National Executive Board shall constitute a trial board before which hearings on the charges before the National Executive Board may be held; provided, however, that the National Executive Board may appoint a hearing officer or officers to act for it for the purpose of holding a hearing.  The National Executive Board may appoint as a hearing officer one (1) or more National Union Officers who shall be impartial.  In cases in which a hearing officer is appointed by the National Executive Board, such hearing officer shall hold such trial under such trial procedure as shall be determined by the National Executive Board; shall make findings of fact and conclusions of law in respect to such charges; and shall recommend to the National Executive Board what disciplinary action, if any, is to be taken by the National Executive Board. In all cases, including those in which a hearing officer is appointed by the National Executive Board, the National Executive Board itself shall determine for itself what disposition should be made of the charges before it.

(j)  The Local/State Executive Board or separate elected trial board for a subordinate body shall constitute the trial board before which hearings on charges may be held; provided,

however, that any such trial board may appoint one (1) or more of its members who shall be impartial, to act for it as hearing officer(s) for the purpose of holding hearings.  In cases in which a hearing officer(s) is appointed, such hearing officer(s) shall hold such trial under such trial procedure as shall be determined by the trial board; shall make findings of fact and conclusions of law in respect to such charges; and shall recommend to the trial board what disciplinary action, if any, is to be taken by the trial board.  In all cases, including those in which a hearing officer(s) is appointed, the trial board itself shall determine for itself what disposition should be made of the charges before it.

(k)  Any decision or disposition of charges by the Executive Board or separate elected trial board of a local union shall be reduced to writing and submitted as a report to the Secretary of the local union, including a synopsis of the testimony introduced at the trial, together with the verdict "guilty" or "not guilty", and the recommended disciplinary action, if any.  Upon receiving the report the Secretary of the local union shall read it at the next regular union meeting, and in the event of a guilty verdict, submit first the question of sustaining the report as to guilt or innocence and, if guilt is determined, then the question of accepting or rejecting the recommended disciplinary action.

However, if the recommended disciplinary action is expulsion, suspension without pay in excess of sixty (60) days or termination of an incumbent elected officer, an affirmative vote to expel from office or terminate the membership of the officer cannot take effect unless confirmed by two-thirds (2/3) of those voting in a referendum on the recommended disciplinary action.  The affected officer shall have ten (10) days to submit a reply to the report.  The report and the reply from the affected officer, if submitted, each of which shall contain no more than one thousand (1,000) words, shall be sent out with each ballot.

SEC. 4.  (a)  Any person or body, against whom disciplinary action has been taken or whose charges have been dismissed in whole or in part, shall have the right to appeal as follows:

(b)  From the disciplinary action of or dismissal of charges by a local union, (1) to the President, (2) to the National Executive Board, and (3) to the National convention.

(c)  From the disciplinary action of or dismissal of the charges by the National Executive Board to the National convention.

(d)  From the disciplinary action of the President (1) to the National Executive Board, and (2) to the National convention.

(e)  In acting as an appeal board, the National Executive Board may appoint one (1) or more National Union Officer(s), who shall be impartial, to act for it for the purpose of **reviewing** any appeal, in which case the member so named shall make recommendation to the National Executive Board concerning the disposition of the appeal, and it shall determine for itself what final disposition shall be made of the appeal.

(f)  Appeals shall be taken within a reasonable time not to exceed thirty (30) days from the date that notice of disposition of the charges or disposition of any intermediate appeal is received; provided, however, that the appellate body may, in its discretion, extend such time for appeal if circumstances so warrant.  Appeals shall be in writing and shall state the basis of the appeal.  The appellant shall be permitted to present such appeal in person before any appellate tribunal, provided, however that in the case of an appeal to a National convention, such personal appeal shall be limited to appearance before the Convention Committee established to deal with appeals unless such appeals committee or the convention itself determines to permit a personal appearance before the National convention.

(g)  Individuals, or subordinate bodies against whom disciplinary action has been taken shall be obliged to exhaust all remedies provided for in this Article and in the Constitution before resorting to a court of law or other tribunal.


ARTICLE 16
FISCAL YEAR – REVENUES & CHARTERS

SEC. 1.  The fiscal year of this Organization shall begin January 1 and end December 31.

SEC. 2.  REVENUES.  (a)  The revenues of this Union shall be derived from a per capita tax of **Six Dollars and Eighty-Eight Cents ($6.88)** per member, bi-weekly, to be paid upon the full paid up membership of all affiliated local unions and members-at-large (said sum to include subscription to the official organ) of which Twenty Cents (20¢) per member, per month is to be returned to the member's respective state organization, with a minimum of **Five Thousand** Dollars **($5,000)** per year to each state organization.  Fifteen Cents (15¢) of the per capita tax will be deposited in a contingency fund.  The national per capita tax and local dues shall be increased when each negotiated salary increase takes effect by the following formula by deducting three percent (3%) of each negotiated salary increase based on level 5, step K, **eight-tenths** percent **(0.8%)** for the APWU **General Fund, seven-tenths percent (0.7%) for the APWU Organizing Fund**, and **one and one-half** percent **(1.5%)**  for the local.  The formula set forth above in the future will apply to members-at-large with the **one and one-half** percent **(1.5%) Local** rebate being sent to the respective state organization.

**On January 1, 2005 the percentages above will be amended to: nine-tenths percent (0.9%) for the General Fund; two-tenths percent (0.2%) for the APWU Organizing Fund; and one and nine-tenths percent (1.9%) for the local and state organizations.**

(b)  When a regional organization is formed in lieu of a state organization, it shall receive

Fifteen Cents (15¢) per member, per month for each member from within the respective states. The regional organization shall receive a minimum of Fifteen Hundred Dollars ($1,500) per year for each state.

(c)  The APWU shall remit Three and One-Half Cents (3½¢) per month, per union member to our National Auxiliary.  Said sum to be derived from our national per capita tax.

(d)  A member of the National Executive Board of the APWU will act as a liaison officer between the parent body and the Auxiliary.

(e)  The APWU shall remit Five Cents (5¢) of the national per capita tax, per month per member to the Postal Press Association.

(f)  That a Disaster Fund be established; that Three Hundred Thousand Dollars ($300,000) of the funds in the Contingency Fund be set aside to be used as the Disaster Fund; and that such Disaster Fund is to be expended in the event of natural disaster as determined by the National Executive Board upon the recommendation of the President.

(g)  **An APWU Organizing Fund shall be established to be used exclusively for Private Sector organizing.**

(h)  Monies earmarked, by Convention actions, for specific programs and staff in all departments must be used only in said programs and staff.

(i)  Local Retiree Chapters chartered to be engaged in APWU Retirees Department Programs shall receive forty percent (40%) of the annual retiree per capita tax per retiree member of that local chapter.  State Retiree Chapters will receive forty percent (40%) of the annual retiree per capita tax per retiree member of that State Retiree Chapter who does not belong to a Local Retiree Chapter.  **Ten (10) or more APWU Retirees Department members, residing within local or area local geographical jurisdiction, may form a Local Retiree Chapter.**

SEC.  3.  ASSESSMENTS.  Special assessments may be levied by the National Executive Board or by a national convention whenever it becomes absolutely necessary to carry on the work of the organization.  A two-thirds (2/3) majority vote of the National Executive Board or a majority vote of a national convention shall be required to approve the assessment before it shall be levied.  Any assessments levied by the National Executive Board shall be effective only until the next regular national convention.

SEC.  4.  Charters will be issued by the APWU National Secretary-Treasurer to locals, area locals, state and regional organizations and district councils, without cost to these subordinate units.  No charter can be issued to a local of less than ten (10**)** members or to a state or regional organization other than as provided in Section 5 of this Article unless authorized by the National Executive Board.

There will be only one (1) local chartered within the same installation, and such local shall have representation on the local executive board from each division reflecting the local union's membership.

SEC. 5.   LOCALS, AREA LOCALS, DISTRICT COUNCILS, STATE & REGIONAL ORGANIZATIONS.  (a)  LOCALS – Ten (10) or more members in the same postal installation may be chartered as a local.

(b)   AREA LOCALS.   The membership of a number of installations in a geographical area or within a sectional center or a combination of sectional centers may join together in a single local upon thirty (30) days notice by secret vote of the majority of the members voting from their respective locals and be issued a charter by the APWU.  However, no member may become affiliated with any other local when there is a local union in the installation where he/she is employed.

(c)  DISTRICT COUNCILS.  Individual members or locals in a limited geographical area may join together for the purpose of carrying on joint activity.   District Councils shall be chartered by the National Executive Board of the APWU.   The District Councils shall be fully autonomous within the limitations of national, state and regional constitutions.

(d)   STATE ORGANIZATIONS.   Two (2) or more district councils or five (5) or more locals within a state may establish a state organization which shall be autonomous within the limitations of the national constitution.

(e)  REGIONAL ORGANIZATIONS.  Five (5) or more locals from more than one (1) state may join together to form a Regional Organization.

SEC. 6.    RESPONSIBILITY OF CHARTERED SUBORDINATE BODIES.    (a)    All chartered locals, area locals, state and regional organizations shall have a constitution and bylaws.   In the absence of such constitution, this constitution shall apply to the extent applicable.

(b)   A copy of each of these constitutions and bylaws must be on file at National Headquarters and shall not be in conflict with the National Constitution.

(c)  Each chartered subordinate body shall be fully autonomous.  Each subordinate local or area local is entitled to title and possession of local assets and funds to which it is entitled by law and by this Constitution except to the extent of its obligation to pay per capita tax to the APWU as provided in this Constitution.  Where a subordinate local, or area local which is not in arrears as to per capita dues, terminates by a majority vote of the members voting by referendum, its affiliation with the APWU, the APWU shall have no claim to the funds and assets of the local, or area local.  But nothing herein shall prohibit the immediate granting of a charter to a local or area local in the same installation or area local.

SEC. 7.   The American Postal Workers Union shall have no claims to any funds or assets belonging to a local or area local, except that which is due it for per capita tax.

SEC. 8.  DELINQUENT LOCALS.  Any local or area local affiliated with APWU which fails to pay its per capita tax on or before the fifteenth (15th) day of the month or fails to pay an assessment within six (6) months, shall be declared delinquent and, if at the end of ninety (90) days following the due date it is still in arrears, the Secretary-Treasurer shall submit the facts to the National Executive Board with his/her recommendation.  Approval of the National Executive Board will be necessary to suspend the local.  Any local remaining suspended for six (6) months, shall surrender its charter to the Secretary-Treasurer and forfeit all privileges in APWU. The same procedures shall apply for delinquent members-at-large.

SEC. 9.   SUSPENDED LOCALS.   A suspended local may be reinstated in this organization upon payment of all arrearages; provided, however, that the National Executive Board shall, in exceptional cases, have the power to excuse such arrearages when circumstances warrant such action.

SEC. 10.  AUDIT OF LOCAL ACCOUNTS.  The Secretary-Treasurer shall have the authority to have the books of any local examined when a local is not remitting per capita tax on the membership to which the APWU is entitled.

SEC. 11.  BONDS.  Officers who are required to be bonded shall have the expense of such bond borne by the Union.


ARTICLE 17
SUBORDINATE BODIES


SEC. 1.   The following subordinate bodies: the Auxiliary and the Postal Press Association, shall include in their respective constitutions provisions which accord to their members, within their own organizations, all rights accorded to members of the National Union under the Members' Bill of Rights and Article 15, Sections 3 and 4, of the Constitution of the American Postal Workers Union, AFL-CIO, as amended, including the right to appeal to the highest governing body of the APWU subordinate body.  In the absence of such provisions in any required constitution, then the rights and procedures guaranteed by the National Constitution shall be provided to members of the non-complying subordinate body.


ARTICLE 18
REFERENDUM

SEC. 1.  Any local of the APWU may prepare and circulate a petition for the purpose of causing a resolution of national importance or amendment to the constitution to be brought to a vote to the whole organization.

SEC. 2.  Before circulating such a petition, the Secretary-Treasurer of the APWU shall be notified, in writing, of such action and furnished with a copy or draft of the proposed question, resolution or amendment.

If such petition is subscribed to by signatures of members of each of twenty (20) locals from eight (8) different states and such total represents at least ten percent (10%) of the overall membership of the APWU, the Secretary-Treasurer must submit such referendum or amendment to constitution to a referendum vote as hereinafter prescribed; provided however, that any Convention of the APWU, may by motion, submit any resolution or amendment to the entire membership.

SEC. 3.  Such petition shall be filed with the Secretary-Treasurer during the month of February only.

SEC. 4.  The proposition and a sample ballot shall be printed in the official organ at least one (1) month before being put to the referendum.

SEC. 5.  Upon receipt of a petition for a referendum vote, the Secretary-Treasurer shall verify its validity to the best of his/her ability and having done so, shall certify to the President that a petition has been duly filed.

A referendum election committee shall be appointed by the President and the referendum shall be conducted in the same manner as election of officers, using an outside ballot association to conduct such referendum.

SEC. 6.  The month of election shall be May of each year and results shall be published in the Union's official organ.

SEC. 7.  If more than one (1) referendum is initiated in the annual period, all questions shall come to a vote at the same time.

SEC. 8.  Arguments for, or against, a referendum shall be printed in the Union's official organ, but not to exceed more than two thousand (2,000) words for a side.  If more than one (1) argument is submitted, the editor is required to publish that which is submitted by the local initiating the proposition to be voted on.

SEC. 9.  It shall require a majority of votes cast to decide all questions, including amendments to the constitution, except at conventions, which shall require a two-thirds (2/3) affirmative vote to carry and decide.

SEC. 10.  Members-at-large shall be entitled to one (1) vote each.

SEC. 11.  No resolution or amendment adopted by a referendum vote of the National membership may be repealed or amended within one (1) year after election, except by a referendum election.

ARTICLE 19

NATIONAL & LOCAL OFFICERS' BENEFITS

SEC. 1.  (a) RETIREMENT.  The APWU shall provide a retirement program for all full-time national, local officers, and such employees of the National Union as the National Executive Board determines.

(b)  The program will be administered by three (3) trustees, appointed by the President with the advice of actuaries and under the direction of the National Executive Board of the APWU who will act as the Board of Directors for the Officers' Retirement Fund.

(c)  Contributions and benefits shall not be less than those provided by the U.S. Postal Service and the Civil Service Retirement Act as amended from time to time.

(d)  All changes to National Officers' wages or benefits, other than those outlined in Article 19, Section 2, must be approved by a majority vote of the National convention.

SEC. 2.  SALARY ADJUSTMENT.  Whenever postal employees are granted a pay increase, the same percentage increase granted members in the bargaining unit at Level 5, Step **L** shall automatically accrue to all paid National Officers of the APWU.

SEC. 3.  (a) LEAVE.  All officers and full-time appointed representatives shall be allowed thirty (30) days annual leave with such sick leave as may be necessary.

(b)  Unused annual leave may either be carried forward for use in future years or paid for at the end of the year in which it is earned at the option of the officer or representative in question; provided, however that no individual may, under this provision, be paid for more than fifteen (15) days of unused annual leave in any one (1) year prior to leaving office; and that national officers will receive the same benefits as bargaining unit employees as achieved through negotiations.  Upon leaving union office, an officer or representative shall, upon application by the individual in question or the estate of a deceased individual, be paid for the days of unused annual leave accumulated under this provision, including those accumulated proportionately during the course of the year in which the individual leaves office.  This subsection (b) will apply to any subordinate body if the constitution of the subordinate body does not specifically address the accumulation, payment and liquidation of unused annual leave.

(c)  Unless specifically enunciated in the constitution of a subordinate body, there shall be no reimbursement for unused sick leave at any time during an officer's service to the subordinate body or upon leaving office with the subordinate body.

(d)  National Officers participating in Federal Employees Health Benefits plans shall pay the same premium to participate in their plan as they would have paid if they were not officers and the Union is authorized to pay the employer share for National Officers on leave from the United States Postal Service.

SEC. 4.  No State or National Officer shall be permitted mileage expenses for their travel if they drive an automobile that was fully assembled in a foreign country and imported into this country.

## ARTICLE 20

## LOCALS, AREA LOCALS, STATE AND REGIONAL ORGANIZATIONS

SEC. 1.  Locals, area locals, state and regional organizations shall have within their organizations representation from each division.

SEC. 2.  Locals, area locals, state and regional organizations shall give consideration to the election of division delegates to all State and national conventions.

SEC. 3.  No division within a local, area local, state and regional organization shall submit a resolution to a state, regional or national convention to affect another division unless the affected division within the local, area local, state and regional organization shall approve of such a resolution.

## ARTICLE 21

## SUCCESSION OF OFFICERS AND VACANCIES

(a)  The President shall fill all vacancies of general officers, administrative and departmental officers and Director of Clerk Division, subject to a majority approval of the National Executive Board.

(b)  In the Motor Vehicle Service (MVS) Division and Maintenance Division, and Clerk Division, the respective Directors shall fill all vacancies subject to the approval of a majority of members of the individual Division Councils.

(c)  In the event of illness or death of the Director of the MVS Division, the Assistant Director of the MVS Division shall assume the responsibilities of the Director of the MVS Division.

(d)  In the event of illness, death or resignation of the Director of the Maintenance Division, the Assistant Director (A) of the Maintenance Division shall assume the responsibilities of the Director of the Maintenance Division.

ARTICLE 22

AMENDMENTS

SEC. 1.  This Constitution may be amended by two-thirds (2/3) vote of the delegates present and voting at a national convention or by a majority vote of those voting by referendum. Amendments approved at national conventions become effective immediately following adjournment of the convention, unless otherwise specified, and amendments approved by referendum become effective immediately following announcement of the official vote unless otherwise specified.

SEC. 2.  The National Executive Board shall have authority between conventions to amend this Constitution and Bylaws as necessary to remove any conflict between its provisions and those of any applicable federal or state law.  The Board is also empowered to modify such provisions as necessary to conform to amendments adopted at national conventions.

ARTICLE 23

STRIKE SANCTION

SEC. 1.  REQUEST FOR STRIKE SANCTION.  Whenever a local Union contemplates the possibility of a strike, the local Union officers shall promptly so advise the office of the National President and request counsel and/or assistance of the National Union.

SEC. 2.  NATIONAL APPROVAL FOR STRIKE SANCTION.  A strike sanction request by a local Union shall be sent to the APWU National Secretary-Treasurer and must first be authorized by a majority vote of the affected members of the local Union in good standing and voting.  The request shall set forth the issues in writing including such information as may be pertinent and required by the Local Executive Board.

(a) The APWU National Secretary-Treasurer shall forward such requests, if in order, to the National Executive Board for their consideration.

(b) The decision of the National Executive Board shall be forwarded to the local Union by the APWU National Secretary-Treasurer.

Strike sanctions, granted by the Executive Board, shall be for a one hundred twenty (120) day period.  No strike may be called thereafter without a renewal for the strike sanction by the National Executive Board.

(c) No local Union shall call a strike without the approval of the APWU National President and strike sanction having been granted by the National Executive Board.

SEC. 3.  LOCAL PROCEDURE FOR STRIKE APPROVAL.

(a)  When a strike has been authorized by the National President, no strike shall occur until the following procedures have been complied with:

(1) A two-thirds (2/3) favorable vote cast by secret ballot by members in good standing and voting in the unit affected.

(2) Approval by the local Union or as their own Constitution and Bylaws might otherwise provide.

A local Union shall not be entitled to National Union strike benefits unless it has complied with these requirements.

(b) No local Union or group shall solicit any funds in support of a strike or lockout without prior approval of the National Executive Board.

(c) Any picket line of any local Union approved by the National Union will be honored by, and receive the full support of all locals and members of the APWU, AFL-CIO to the extent possible under the law.

BYLAWS

ARTICLE 1

CONVENTION ORDER OF BUSINESS

SECTION 1.

    1.    Roll call of Officers

    2.    Report of Committee on credentials

    3.    Roll call of delegates

    4.    Report of officers

    5.    Report of finance committee

    6.    Report of special committees

    7.    Unfinished business

    8.    Reports of standing convention committees

    9.    New business

    10.    Adjournment

SECTION 2.

    The order of business may be transposed at any time by a majority vote of the delegates assembled in convention.

ARTICLE 2

QUORUM

SECTION 1.

    Twenty-five percent (25%) of the delegates present at a convention shall constitute a quorum, but less than the number may adjourn to meet at a future specified time.

ARTICLE 3

RULES OF ORDER

SECTION 1.

    In the absence of other authority, the deliberations of this Union shall be governed by Robert's Rules of Order.

ARTICLE 4

AMENDMENTS

SECTION 1.

Amendments to these Bylaws may be made in the same manner as prescribed for Amendments to the Constitution.

FOR BACK COVER PAGE ...

American Postal Workers Union, AFL-CIO

1300 L Street, N.W.

Washington, D.C.   20005

(202) 842-4200

# COLLECTIVE BARGAINING AGREEMENT

Between
**American
Postal Workers
Union, AFL-CIO**

And
**U.S. Postal Service**

**November 21, 2000
November 20, 2006**



## EXHIBIT B

### Article 15.1

#### Section 9.  Field Federal Safety and Health Councils

In those cities where Field Federal Safety and Health Councils exist, one representative of the Union who is on the Local Safety and Health Committee in an independent postal installation in that city and who serves as a member of such Councils, will be permitted to attend the meetings. Such employee will be excused from regularly assigned duties without loss of pay. Employer authorized payment as outlined above will be granted at the applicable straight time rate, provided the time spent in such meetings is a part of the employee's regular work day.

(The preceding Article, Article 14, shall apply to Transitional Employees)

## ARTICLE 15
## GRIEVANCE-ARBITRATION  PROCEDURE

#### Section 1.  Definition

A grievance is defined as a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment. A grievance shall include, but is not limited to, the complaint of an employee or of the Union which involves the interpretation, application of, or compliance with the provisions of this Agreement or any local Memorandum of Understanding not in conflict with this Agreement.

#### Section 2.  Grievance Procedure Steps

#### Step 1:

(a)  Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within

fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause. The employee, if he or she so desires, may be accompanied and represented by the employee's steward or a Union representative. The Union also may initiate a grievance at Step l within l4 days of the date the Union first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case the participation of an individual grievant is not required. A Step l Union grievance may involve a complaint affecting more than one employee in the office. When the Union files a class action grievance, Management will designate the appropriate employer representative responsible for handling such complaint.

(b)   In any such discussion the supervisor shall have authority to settle the grievance. The steward or other Union representative likewise shall have authority to settle or withdraw the grievance in whole or in part. No resolution reached as a result of such discussion shall be a precedent for any purpose.

(c)   If no resolution is reached as a result of such discussion, the supervisor shall render a decision orally stating the reasons for the decision. The supervisor's decision should be stated during the discussion, if possible, but in no event shall it be given to the Union representative (or the grievant, if no Union representative was requested) later than five (5) days thereafter unless the parties agree to extend the five (5) day period. Within five (5) days after the supervisor's decision, the supervisor shall, at the request of the Union representative, initial the standard grievance form that is used at Step 2 confirming the date upon which the decision was rendered.

(d)   The Union shall be entitled to appeal an adverse decision to Step 2 of the grievance procedure within ten (10) days after receipt of the supervisor's decision. Such appeal

### Article 15.2 (Step 2)

shall be made by completing a standard grievance form developed by agreement of the parties, which shall include appropriate space for at least the following:

1. Detailed statement of facts;

2. Contentions of the grievant;

3. Particular contractual provisions involved; and

4. Remedy sought.

**Step 2:**

(a)   The standard grievance form appealing to Step 2 shall be filed with the installation head or designee. In any associate post office of twenty (20) or less employees, the Employer shall designate an official outside of the installation as the Step 2 official, and shall so notify the Union Step 1 representative.

(b)   Any grievance initiated at Step 2, pursuant to Article 2 or 14 of this Agreement, must be filed within 14 days of the date on which the Union or the employee first learned or may reasonably have been expected to have learned of its cause.

(c)   The installation head or designee will meet with the steward or a Union representative as expeditiously as possible, but no later than seven (7) days following receipt of the Step 2 appeal unless the parties agree upon a later date. In all grievances appealed from Step 1 or filed at Step 2, the grievant shall be represented in Step 2 for all purposes by a steward or a Union representative who shall have authority to settle or withdraw the grievance as a result of discussions or compromise in this Step. The installation head or designee in Step 2 also shall have authority to grant or settle the grievance in whole or in part.

(d)   At the meeting the Union representative shall make a full and detailed statement of facts relied upon, contractual provisions involved, and remedy sought. The Union representative may also furnish written statements from witnesses or other individuals. The Employer representative shall also make a full and detailed statement of facts and contractual provisions relied upon. The parties' representatives shall cooperate fully in the effort to develop all necessary facts, including the exchange of copies of all relevant papers or documents in accordance with Article 31. The parties' representatives may mutually agree to jointly interview witnesses where desirable to assure full development of all facts and contentions. In addition, in cases involving discharge either party shall have the right to present no more than two witnesses. Such right shall not preclude the parties from jointly agreeing to interview additional witnesses as provided above.

(e)   Any settlement or withdrawal of a grievance in Step 2 shall be in writing or shall be noted on the standard grievance form, but shall not be a precedent for any purpose, unless the parties specifically so agree or develop an agreement to dispose of future similar or related problems.

(f)   Where agreement is not reached the Employer's decision shall be furnished to the Union representative in writing, within ten (10) days after the Step 2 meeting unless the parties agree to extend the ten (10) day period. The decision shall include a full statement of the Employer's understanding of (1) all relevant facts, (2) the contractual provisions involved, and (3) the detailed reasons for denial of the grievance.

(g)   If the Union representative believes that the facts or contentions set forth in the decision are incomplete or inaccurate, such representative should, within ten (10) days of receipt of the Step 2 decision, transmit to the Employer's representative a written statement setting forth corrections or

**Article 15.2.(Step 3)**

additions deemed necessary by the Union. Any such statement must be included in the file as part of the grievance record in the case. The filing of such corrections or additions shall not affect the time limits for appeal to Step 3 or arbitration.

(h)    The Union may appeal an adverse Step 2 decision to Step 3. Any such appeal must be made within fifteen (15) days after receipt of the Employer's decision unless the parties' representatives agree to extend the time for appeal. However, the Union may appeal an adverse Step 2 decision directly to arbitration for disciplinary grievances or contract grievances which involve the interpretation, application of, or compliance with the provisions of any local Memorandum of Understanding not in conflict with this Agreement, and those issues the parties have agreed are appealed to Expedited Arbitration.  These grievances will be appealed to the appropriate Grievance/Arbitration Processing Center within thirty (30) days after the receipt of the Employer's Step 2 decision. Any appeal must include copies of (1) the standard grievance form, (2) the Employer's written Step 2 decision, and, if filed, (3) the Union corrections or additions to the Step 2 decision.

**Step 3:**

(a)    Any appeal from an adverse decision in Step 2 shall be in writing to the appropriate management official at the Grievance/Arbitration Processing Center, with a copy to the Employer's Step 2 representative, and shall specify the reasons for the appeal.

(b)    The grievant shall be represented at the Employer's Step 3  Level by a Union's Regional representative, or designee. The Step 3 meeting of the parties' representatives to discuss the grievance shall be held within fifteen (15) days after it has been appealed to Step 3. Each party's representative shall be responsible for making certain that all

relevant facts and contentions have been developed and considered. The Union representative shall have authority to settle or withdraw the grievance in whole or in part. The Employer's representative likewise shall have authority to grant the grievance in whole or in part. In any case where the parties' representatives mutually conclude that relevant facts or contentions were not developed adequately in Step 2, they shall have authority to return the grievance to the Step 2 level for full development of all facts and further consideration at that level. In such event, the parties' representatives at Step 2 shall meet within seven (7) days after the grievance is returned to Step 2. Thereafter, the time limits and procedures applicable to Step 2 grievances shall apply.

(c) The Employer's written Step 3 decision on the grievance shall be provided to the Union's Step 3 representative within fifteen (15) days after the parties have met in Step 3, unless the parties agree to extend the fifteen (15) day period. Such decision shall state the reasons for the decision in detail and shall include a statement of any additional facts and contentions not previously set forth in the record of the grievance as appealed from Step 2. If either party's Step 3 representative believes that an interpretive issue under the National Agreement or some supplement thereto which may be of general application is involved in the case, the issue will be discussed with the appropriate National Union/Management Representatives at the Headquarters Level. If either party's National Representative determines the issue to be interpretive, a written notice will be sent to the other party specifying in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the initiating party's contention.   The grievance(s) shall be held at the Area and/or District Level pending discussion at the national level or the outcome of a National Arbitration award.

(d) The Union may appeal an adverse decision directly to arbitration at the appropriate Grievance/Arbitration Process-

**Article 15.2.(Step 3)**

ing Center within twenty-one (21) days after the receipt of the Employer's Step 3 decision in accordance with the procedure hereinafter set forth.

(e)   Where grievances appealed to Step 3 involve the same, or substantially similar issues or facts, one such grievance to be selected by the Union representative shall be designated the "representative" grievance. If not resolved at Step 3, the "representative" grievance may be appealed to arbitration in accordance with the above and placed at the head of the appropriate arbitration docket, or the issue will be referred to the parties' national representatives at the Headquarters level pursuant to (c) above. All other grievances which have been mutually agreed to as involving the same, or substantially similar issues or facts as those involved in the "representative" grievance shall be held at Step 3 pending resolution of the "representative" grievance, provided they were timely filed at Step 1 and properly appealed to Steps 2 and 3 in accordance with the grievance procedure.

Following resolution of the "representative" grievance, the parties involved in that grievance shall meet at Step 3 to apply the resolution to the other pending grievances involving the same, or substantially similar issues or facts. Disputes over the applicability of the resolution of the "representative" grievance shall be resolved through the grievance-arbitration procedures contained in this Article; in the event it is decided that the resolution of the "representative" grievance is not applicable to a particular grievance, the merits of that grievance shall also be considered.

(f)   In order to discourage the filing of multiple local grievances involving any new or changed District or Area-wide policy, instructions, or guidelines, the APWU Regional Coordinator or National Business Agent may file one grievance concerning such policy, instructions, or guidelines, directly at Step 3 of the grievance procedure.  The grievance

**Article 15.2.(Step 4)**

may be filed within fourteen (14) days of the date on which such union representative first learned or may reasonably have been expected to have learned of the implementation of such policy, instructions, or guidelines.    Timely local grievances, which had already been filed concerning such policy, instructions, or guidelines, will be held at or returned to Step 2 of the grievance procedure, as applicable, pending the resolution of the grievance filed directly at Step 3. Thereafter, local grievances will be finally adjudicated in accordance with the resolution of the grievance filed directly at Step 3. If not resolved, the grievance filed directly at Step 3 may be appealed to arbitration within twenty-one (21) days and placed at the head of the appropriate arbitration docket.

**Step 4:**

(a)  In any dispute properly initiated at this Step by the appropriate National Union/Management Representative, the parties shall meet at the National level promptly, but in no event later than thirty (30) days after initiating  such dispute in an effort to define the precise issues involved, develop all necessary facts and reach agreement. The Union representative shall have authority to settle or withdraw the dispute in whole or in part. The Employer's representative shall have authority to grant or settle the dispute in whole or in part. The parties' Step 4 representatives may, by mutual agreement, return any dispute to Step 3 where (a) the parties agree that no national interpretive issue is fairly presented or (b) it appears that all relevant facts have not been developed adequately. In such event, the parties shall meet at Step 3 within fifteen (15) days after the dispute is returned to Step 3. Thereafter the procedures and time limits applicable to Step 3 grievances shall apply.  Should the parties at the National level fail to reach agreement, then within fifteen (15) days of such meeting each party shall provide the other with a statement in writing of its understanding of the issues involved, and the facts giving rise to the interpretive dispute. In the event the parties have failed to reach agreement within

97

**Article 15.3**

sixty (60) days of the initiation of the dispute, the Union then may appeal it to national arbitration within thirty (30) days thereafter. Any local grievances filed on the specific interpretive issue shall be held in abeyance at the appropriate level pending resolution of the national interpretive dispute.

[see Memo, page 316]

**Section 3. Mediation**

Where the local parties identify the need for either assistance in the grievance/arbitration procedure or the need to improve the labor/management relationship, the following mediation process may be invoked:

   A. The local installation head and the local Union president (local parties) may jointly initiate a request for mediation where they identify such a need in a particular installation. Such joint request must be in writing and submitted to the parties' designated Area/Regional level representatives.

   B. Such Area/Regional level representatives may also recommend mediation for a particular installation. However, when a recommendation for mediation is made by the Area/Regional level representatives, such recommendation must be discussed with and agreed to by the local parties before the mediation process can be invoked at the local site.

   C. The mediation will be conducted jointly by the Union official designated by the President of the Union and management official designated by the Vice President/Labor Relations (USPS). The designated officials will have been trained, and/or certified in the dispute resolution process. Such designated union/management mediation representatives will be utilized to assist the local parties in an effort to resolve timely grievances, as defined in Article 15,

**Article 15.3.F**

Sections 1 and 2, as well as any identified local issues or problems.

D. The designated union/management mediation representatives will meet at the local installation within thirty (30) days of the joint mediation request, which is described in Section 3.A or B above. At least seven (7) days prior to the on-site meeting, the local parties will jointly provide the mediation representatives with an agenda and all available relevant information. In the event the local parties cannot agree on an agenda for mediation, each party will submit their respective agendas to the mediation representatives seven (7) days prior to the on-site meeting, as well as all available relevant information.

E. The mediation will be held with the local parties to explore ways of resolving the previously submitted agenda items, as well as to seek ways of improving the labor/management climate within the installation. The mediation process, including all meetings connected with mediation, is considered to be off-the-record. However, all resolutions will be on the record, in writing and jointly signed by the local parties. Where the local parties agree, a particular mediation resolution(s) will serve as precedent for that installation, provided such resolution does not violate the National Agreement.

If the local parties are unable to reach a resolution on pending grievances of those local issues for which they have jointly requested mediation, then the mediation representatives may jointly resolve any of the above referenced issues or grievances.

F. The Employer's mediation    representative will provide to the appropriate Union official a statement of position for each grievance(s) listed on the agenda, which is not resolved through mediation, within fifteen (15) days of the final mediation meeting. Within twenty-one (21) days of

### Article 15.4

receipt of the statement of position, the Union may appeal such grievance(s) to District level arbitration.

### Section 4. Grievance Procedure - General

A. The parties expect that good faith observance, by their respective representatives, of the principles and procedures set forth above will result in settlement or withdrawal of substantially all grievances initiated hereunder at the lowest possible step and recognize their obligation to achieve that end. **Every effort shall be made to ensure timely compliance and payment of monetary grievance settlements and arbitration awards. The Employer agrees that upon receipt of necessary paperwork from the grievant and/or union, concerning a grievance settlement or arbitration award, monetary remuneration will be made. The necessary paperwork is the documents and statements specified in Subchapter 436.4 of the ELM. The Employer will provide the union copies of appropriate pay adjustment forms, including confirmation that such forms were submitted to the appropriate postal officials for compliance and that action has been taken to ensure that affected employee(s) receives payment and/or other benefits. In the event that an employee is not paid within sixty (60) days after submission of all the necessary paperwork, such employee, upon request, will be granted authorization from management to receive a pay advance equal to the net amount due, or seventy (70) percent of the gross payment owed the employee, whichever is less. In the event of a dispute between the parties concerning the correct amount to be paid, the advance required by this section will be the amount that is not in dispute.**

B. The failure of the employee or the Union in Step 1, or the Union thereafter to meet the prescribed time limits of the Steps of this procedure, including arbitration, shall be considered as a waiver of the grievance. However, if the

**Article 15.5.A**

Employer fails to raise the issue of timeliness at Step 2, or at the step at which the employee or Union failed to meet the prescribed time limits, whichever is later, such objection to the processing of the grievance is waived.

C. Failure by the Employer to schedule a meeting or render a decision in any of the Steps of this procedure within the time herein provided (including mutually agreed to extension periods) shall be deemed to move the grievance to the next Step of the grievance-arbitration procedure.

D. It is agreed that in the event of a dispute between the Union and the Employer as to the interpretation of this Agreement, such dispute may be initiated at the Step 4 level by either party. Such a dispute shall be initiated in writing and must specify in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the contention of either party. Thereafter the parties shall meet in Step 4 within thirty (30) days in an effort to define the precise issues involved, develop all necessary facts, and reach agreement. Should they fail to agree, then, within fifteen (15) days of such meeting, each party shall provide the other with a statement in writing of its understanding of the issues involved, and the facts giving rise to such issues. In the event the parties have failed to reach agreement within sixty (60) days of the initiation of the dispute in Step 4, the Union then may appeal it to arbitration, within thirty (30) days thereafter. Any local grievances filed on the specific interpretive issue shall be held in abeyance at the appropriate level pending resolution of the national interpretive dispute.

**Section 5. Arbitration**

**A. General Provisions**

1. A request for arbitration shall be submitted within the specified time limit for appeal.

**Article 15.5.A.2**

2. No grievance may be arbitrated at the National level except when timely notice of appeal is given the Employer in writing by the National President of the Union. No grievance may be appealed to arbitration at the District panel level except when timely notice of appeal is given in writing to the appropriate management official at the Grievance/Arbitration Processing Center by the certified representative of the Union in the Area. Such representative shall be certified to appeal grievances by the National President of the Union to the Employer at the National level.

3. All grievances appealed to arbitration will be placed on the appropriate pending arbitration list in the order in which appealed. The Employer, in consultation with the Union, will be responsible for maintaining appropriate dockets of grievances, as appealed, and for administrative functions necessary to assure efficient scheduling and hearing of cases by arbitrators at all levels.

4. In order to avoid loss of available hearing time, except in National level cases, a minimum of six (6) expedited or three (3) regular cases, when available, are to be scheduled for each hearing date. In addition, pending cases on the docket in the order in which appealed should be assigned to the designated advocates no less than sixty (60) days prior to the scheduled date and, if possible, the parties will discuss the cases no less than thirty (30) days prior to the scheduled date. The parties agree that backup cases will include all cases pending arbitration at the location. These backup cases will be scheduled in the order they appear on the District docket when available in the event of late settlement or withdrawal of grievances before the hearing. In the event that either party withdraws all cases less than

**Article 15.5.A.6**

five (5) days prior to the scheduled arbitration date, and the parties are unable to agree on scheduling other cases on that date, the party withdrawing the cases shall pay the full costs of the arbitrator for that date. In the event that the parties settle and/or withdraw all cases five (5) or more days prior to the scheduled arbitration date, backup case**s** on the appropriate arbitration list shall be scheduled. If the parties settle case**s** less than five (5) days prior to the scheduled arbitration date and are unable to agree to schedule another case, the parties shall share the costs of the arbitrator for that date. This paragraph shall not apply to National level arbitration cases.

5. Arbitration hearings normally will be held during working hours where practical. Employees whose attendance as witnesses is required at hearings during their regular working hours shall be on Employer time when appearing at the hearing, provided the time spent as a witness is part of the employee's regular working hours. Absent a more permissive local past practice and at no cost to the Employer, the Employer will permit one (1) change of work schedule per case scheduled for arbitration for either the grievant or a witness, provided notice is given to his or her immediate supervisor at least two (2) days prior to the scheduled arbitration hearing.

6. All decisions of an arbitrator will be final and binding. All decisions of arbitrators shall be limited to the terms and provisions of this Agreement, and in no event may the terms and provisions of this Agreement be altered, amended, or modified by an arbitrator. Unless otherwise provided in this Article, all costs, fees, and expenses charged by an arbitrator will be shared equally by the parties.

103

**Article 15.5.A.7**

7. All arbitrators on the Regular District Panels and the Expedited Panels and on the National Panel shall serve for the term of this Agreement and shall continue to serve for six (6) months thereafter, unless the parties otherwise mutually agree.

8. Arbitrators on the National Panel and on the Regular and Expedited District Panels shall be selected by the method agreed upon by the parties at the National Level.

9. In any arbitration proceeding in which a Union feels that its interests may be affected, it shall be entitled to intervene and participate in such arbitration proceeding, but it shall be required to share the cost of such arbitration equally with any or all other Union parties to such proceeding. Any dispute as to arbitrability may be submitted to the arbitrator and be determined by such arbitrator. The arbitrator's determination shall be final and binding.

**B. District Level Arbitration - Regular**

1. At the appropriate Grievance/Arbitration Processing Center four (4) separate lists of cases to be heard in arbitration shall be maintained for the Union: (a) one for all removal cases and cases involving suspensions for more than 14 days or 14 days or less referred from Expedited Arbitration, (b) one for all cases referred to Expedited Arbitration, (c) one for Contract disputes, and (d) one for Impasses from Local Negotiations appealed to arbitration at the appropriate Grievance/Arbitration Processing Center. In each District separate panels will be established for scheduling and hearing cases involving (a) removals and suspensions for more than 14 days, and suspensions of 14 days or less referred from Expedited Arbitration; (b) Contract

104

**Article 15.5.B.5**

disputes, (c) cases referred to Expedited Arbitration, and (d) Impasses from Local Negotiations.

a. Arbitration hearings are to be scheduled and heard within 120 days following receipt of the arbitration appeal, unless the parties agree upon a later date.

[see Memo, page 317]

2. Cases will be scheduled for arbitration in the order in which appealed, unless the Union and Employer otherwise agree. **Prior to arbitration dates being scheduled by the parties for the next round of scheduling, each party may, at its option, advance one case per month to the top of the docket.**

3. Only discipline cases involving suspensions of 14 days or less and those other disputes as may be mutually determined by the parties shall be referred to Expedited Arbitration in accordance with Section C hereof.

[see Memo, page 311]

4. Cases referred to arbitration, which involve removals or suspensions for more than 14 days, shall be scheduled for hearing at the Grievance/Arbitration Processing Center at the earliest possible date in the order in which appealed by the Union.

5. If either party believes that a case referred to Regular Arbitration involves an interpretative issue under the National Agreement or some supplement thereto which may be of general application, that party's representative shall request input from their appropriate National Representative at the

**Article 15.5.B.5**

> Headquarters level. If either party's representative at the Headquarters level determines the case is interpretive, a notice will be sent to the other party. The case will be held pending the outcome of the National interpretive dispute. If both parties' representatives determine the case does not involve an interpretive issue, the case if already scheduled for arbitration will be heard before the same arbitrator who was originally scheduled to hear the case. Further, if the hearing had convened, the case will continue at the same stage of arbitration.

[see Memo, page 316]

6. The arbitrators on each Regular District Panel shall be scheduled to hear cases on a rotating system basis, unless otherwise agreed by the parties. The hearing time available for arbitration will be distributed among offices and crafts.

7. Normally, there will be no transcripts of arbitration hearings or filing of post-hearing briefs in cases heard in Regular District level arbitration, except either party at the National level may request a transcript. Either party at the hearing may request to file a post-hearing brief in contract arbitrations. In Regular District level discipline/discharge arbitrations, post-hearing briefs will be permitted only by mutual agreement of the parties or by direction of the arbitrator. However, each party may file a written statement setting forth its understanding of the facts and issues and its argument at the beginning of the hearing and also shall be given an adequate opportunity to present argument at the conclusion of the hearing.

8. The arbitrator in any given case should render an

award therein within thirty (30) days of the close of the record in the case.

### C. District Level Arbitration - Expedited

1. The parties agree to continue the utilization of an expedited arbitration system for disciplinary cases of 14 days suspension or less which do not involve interpretation of the Agreement and for such other cases as the parties may mutually determine.

    [see Memo, page 311]

2. If either party concludes that the issues involved are of such complexity or significance as to warrant reference to the Regular District Arbitration Panel, that party shall notify the other party of such reference at least twenty-four (24) hours prior to the scheduled time for the expedited arbitration.

3. The hearing shall be conducted in accordance with the following:

    a. the hearing shall be informal;

    b. no briefs shall be filed or transcripts made;

    c. there shall be no formal rules of evidence;

    d. the hearing shall normally be completed within one day;

    e. if the arbitrator or the parties mutually conclude at the hearing that the issues involved are of such complexity or significance as to warrant reference to the Regular District Arbitration Panel, the case shall be referred to that panel; and

107

**Article 15.5.C.3.f**

    f.   the arbitrator may issue a bench decision at the hearing but in any event shall render a decision within forty-eight (48) hours after conclusion of the hearing. Such decision shall be based on the record before the arbitrator and may include a brief written explanation of the basis for such conclusion. These decisions will not be cited as a precedent. The arbitrator's decision shall be final and binding. An arbitrator who issues a bench decision shall furnish a written copy of the award to the parties within forty-eight (48) hours of the close of the hearing.

4.  No decision by a member of the Expedited Panel in such a case shall be regarded as a precedent or be cited in any future proceeding, but otherwise will be a final and binding decision.

5.  The Expedited Arbitration Panel shall be developed by the National parties, on a District level.

**D.  National Level Arbitration**

1.  Only cases involving interpretive issues under this Agreement or supplements thereto of general application will be arbitrated at the National level.

2.  A docket of cases appealed to arbitration at the National level shall be maintained for the Union. The arbitrators on the National Panel shall be scheduled to hear cases on a rotating system basis, unless otherwise agreed by the parties. Cases on the docket will be scheduled for arbitration in the order in which appealed, unless the Union and Employer otherwise agree.

#### Section 6. Administration

The parties recognize their continuing joint responsibility for efficient functioning of the grievance procedure and effective use of arbitration. Commencing April 1, 1979, and quarterly thereafter, the Employer will furnish to the President of the Union a copy of a quarterly report containing the following information covering operation of the arbitration procedure at the National level, and for each Grievance/Arbitration Processing Center separately:

- (a) number of cases appealed to arbitration;

- (b) number of cases scheduled for hearing;

- (c) number of cases heard;

- (d) number of scheduled hearing dates, if any, which were not used;

- (e) the total number of cases pending but not scheduled at the end of the quarter.

(The preceding Article, Article 15, shall apply to Transitional Employees)

[see Memo, page 317]

#### ARTICLE 16
#### DISCIPLINE PROCEDURE

#### Section 1. Principles

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to,

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LORRAINE A. KOKINCHAK,<br><br>       Plaintiff,<br><br>v.<br><br>UNITED STATES POST OFFICE (WILLIAM J. HENDERSON, POSTMASTER GENERAL), AMERICAN POSTAL WORKERS UNION (APWU) (NATIONAL), AMERICAN POSTAL WORKERS UNION, AFL-CIO, RED BANK LOCAL, AND JEFFREY BRENTS,<br><br>       Defendants. | Civ. No. 99-4835 (WGB)<br><br><br>O P I N I O N |

APPEARANCES:

Edward G. Hanratty, Esq.
KLATSKY & KLATSKY
320 Broad St.
P.O. Box 8819
Red Bank, NJ 07701

    Attorney for Plaintiff

Jesse H. Strauss, Esq.
REITMAN PARSONNET
744 Broadway St., Suite 1807
Newark, NJ 07102

    Attorneys for Defendant American Postal Workers Union, AFL-CIO

James Patton, Esq.
554 South Livingston Ave.
Livingston, NJ 07039

    Attorneys for Defendant American Postal Workers Union, AFL-CIO Red Bank Local

**BASSLER, DISTRICT JUDGE:**

Plaintiff Lorraine A. Kokinchak ("Plaintiff") has been employed by the United States Post Office ("Post Office") in various capacities for approximately 20 years. She is currently employed by the Post Office as a "floor expeditor." She is a member of Defendant American Postal Workers Union, AFL-CIO Red Bank Local ("Local") and is also a member of Defendant American Postal Workers Union, AFL-CIO ("APWU"). The Local is chartered by the APWU, which a fully autonomous labor organization. (Declaration of Robert L. Tunstall ("Tunstall Decl." or "Tunstall Declaration"), at ¶ 3.) Plaintiff is neither an officer or an employee of the APWU. (Id. at ¶ 4.)

Defendant Jeffrey Brents ("Brents") was also an employee of the Post Office and a member of the Local and of the APWU. (Id. at ¶ 5.) Although Brents was not an employee of either the Local or the APWU, he was a shop steward[1] for the Local. (Id. at ¶¶ 5-6.)

In her complaint, Plaintiff alleges that Defendants APWU and the Local (collectively "the Unions"), are each liable under 42 U.S.C. § 2000e, et seq., ("Title VII") and the New Jersey Law

---

[1] According to section 1 of Article XVII of the Collective Bargaining Agreement ("CBA"), "[s]tewards may be designated for the purpose of investigating, presenting and adjusting grievances."

Against Discrimination ("LAD")[2] because their agent, Brents, sexually harassed her.  (Amended Compl., ¶¶ 30, 37, 41, 71.)  In addition, Plaintiff claims that the APWU and the Local had an affirmative duty to alleviate the alleged sexual harassment that was occurring in Plaintiff's workplace, and the failure to comply with that duty was acquiescence to the alleged discrimination for which the APWU and the Local are each liable under Title VII and the LAD.  (Id. at ¶¶ 21, 24, 36, 44, 67, 71, 72, 78, 80.)  Under the third theory, Plaintiff alleges that the APWU and the Local breached their duty of fair representation by refusing her requests for help in alleviating the alleged discrimination. (Id. at ¶¶ 38-39, 44, 67, 68, 71, 72, 81.)

The APWU and the Local separately move to dismiss or in the alternative for summary judgment.  For the following reasons, the APWU's motion for summary judgment is **granted.**  The Local's motion for summary judgment is **granted.**

I.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate only if all the probative materials of the record "show that there is no genuine issue as to any material

---

[2]  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Hersh v. Allen Prods. Co.</u>, 789 F.2d 230, 232 (3d Cir. 1986); <u>Lang v. New York Life Ins. Co.</u>, 721 F.2d 118, 119 (3d Cir. 1983).  The court must resolve all reasonable doubts in favor of the nonmoving party.  <u>Meyer v. Riegel Prods. Corp.</u>, 720 F.2d 303, 307 n.2. (3d Cir. 1983), *cert. dismissed*, 465 U.S. 1091 (1984); <u>Smith v. Pittsburgh Gage & Supply Co.</u>, 464 F.2d 870, 874 (3d Cir. 1972).

Under the standards announced by the Supreme Court's trilogy in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), and <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original).  Where the moving party has made a properly supported motion for summary judgment, it is incumbent upon the nonmoving party to come forward with specific facts to show that there is a genuine issue of material fact for trial.  <u>Anderson</u>, 477 U.S. at 248.  Thus, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the nonmoving party "may not rest upon mere allegations or denials", Fed. R. Civ. P. 56(e), but must produce sufficient evidence that will reasonably support a jury verdict in its favor.  <u>J.E. Mamiye</u>

4

& Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir. 1987).
The nonmoving party may not merely raise "some metaphysical doubt
as to material facts." Matsushita, 475 U.S. at 586.

B.   Vicarious Liability

Plaintiff's complaint alleges that Defendant Brents sexually
harassed Plaintiff in the workroom floor of the Post Office and
at Plaintiff's personal residence.  Amended Compl., at ¶¶ 16, 48.
Plaintiff claims that the Unions are liable for the acts of
Brents under agency principles.  The Unions dispute that there
was an agency relationship between either the APWU and Brents or
between the Local and Brents.

1.   The APWU

a.   Brents as Agent of The APWU

Plaintiff maintains that the APWU is vicariously liable for
Brents' conduct because Brents' duties and responsibilities as
shop steward were derived from the Collective Bargaining
Agreement[3] ("CBA"), of which APWU is a signatory.  While the
Local does not dispute that Brents was a steward for the Local,[4]

---

[3]  Section 1 of Article XVII of the CBA provides:
"[s]tewards may be designated for the purpose of investigating,
presenting and adjusting grievances."

[4]  Citing to ¶ 6 of the Tunstall Declaration, Plaintiff
contends that the APWU admits that Brents was a steward of the
APWU.  Plaintiff, however, fails to distinguish between the APWU
and the Local.  What the Tunstall Declaration provides is that
"[i]t is the APWU's belief and understanding that Jeffrey Brents
is a steward of the Local."  Tunstall Decl., at ¶ 6 (emphasis
added).

5

Plaintiff does not provide any authority to support her theory that Brents is an agent of the APWU based solely on the fact that the APWU is a signatory to the CBA.

> b. The Local as Agent of The APWU

Because Plaintiff alleges that Brents was acting within the scope of his authority as shop steward for the Local, the Court, for purposes of this discussion only, will assume that Brents was in fact acting as an agent of the Local and examine whether the APWU is liable for the conduct of Brents by way of the Local.

In analyzing the vicarious liability of an international union for the discriminatory actions of its local affiliate, federal courts apply common law agency principles.[5] Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1429 (D.C. Cir. 1988), cert. denied, 490 U.S. 1105 (1989) (noting that "common-law agency principles apply equally to determine an international union's liability under the civil rights laws as they do in other contexts . . .").

"The test to determine whether an agency relationship exists is essentially one of balancing the character of the business affairs subject to the International's control and supervision against those left to the discretion of the local." Alexander v.

---

[5] New Jersey courts have analyzed cases of discrimination under LAD by a union against a member by looking to analogous Title VII cases. Giammario v. Trenton Bd. of Educ., 203 N.J. Super. 356 (App. Div. 1985), certif. denied, 102 N.J. 336, cert. denied, 475 U.S. 1141 (1985).

Local 496, Laborers Int'l Union of North America, 778 F. Supp. 1401, 1420 (N.D. Ohio 1991) (citing Berrigan v. Greyhound Lines, Inc., 560 F. Supp. 165, 169 (D. Mass. 1982)). Courts have found no agency relationship between an international union and a local where the local union is solely or primarily responsible for the challenged activity. In EEOC v. International Brotherhood of Elec. Workers (I.B.E.W.), 476 F. Supp. 341, 346 (D. Mass. 1979), a local union retaliated against a member for filing a discrimination complaint by imposing disciplinary measures under union rules. The court found that the international was not liable for the discriminatory retaliation because the local had primary responsibility for employment matters and the discipline of members for violation of union rules.

The APWU's uncontroverted affidavit establishes that its local affiliates are fully autonomous. Tunstall Decl., at ¶ 3. The Local has its own constitution, bylaws, and officers. Id. The Local is separate and distinct from the APWU. Id. Moreover, Brents was selected, appointed, and certified as a steward for the Local by the Local in accordance with the Local's Constitution and Bylaws. Id. at 6. The removal and decertification of stewards is also done by local affiliates in accordance with the local union's constitutions and bylaws. Id. The APWU does not select, appoint, or certify local union stewards. Id. The APWU also is not involved in removing or

7

decertifying local union stewards.  Id.

Plaintiff has simply not proffered any evidence of the APWU's control, involvement or knowledge of the day-to-day activities at the Local or of Brents' conduct.  In opposition to the APWU's affidavit that the Local is fully autonomous, Plaintiff fails to raise even a "metaphysical doubt as to the facts."  Matsushita, 475 U.S. at 586.  Therefore, there was no agency relationship between the APWU and the Local or Brents.

> c.  Ratification or Authorization of Acts of The
>     Local or Brents

Even if the Local or Brents was an agent of the APWU, the APWU would not be liable for Brents' conduct because it did not ratify or authorize his actions.  "[A] collective entity, including a labor organization, 'may only be held responsible for the authorized or ratified actions of its officers and agents.' This standard of liability extends generally to situations in which an international union is sued for the conduct of its affiliated local."  Berger, 843 F.2d at 1427 (citations omitted) (emphasis added); see also Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 217-18 (1979) (finding international union not liable for damages caused by unauthorized "wildcat" strikes by local unions); Anjelino v. The New York Times Co., 200 F.3d 73 (3d Cir. 2000) (affirming dismissal of Title VII discrimination claims against union because record did not demonstrate that union instigated or actively supported alleged

8

discriminatory acts); <u>Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America</u>, 927 F.2d 1283 (3d Cir. 1991) (holding international union not liable because plaintiff's conclusory allegations of union's failure to intervene in alleged discriminatory retaliation did not constitute ratification or encouragement).

A union, however, cannot ratify or authorize conduct of which it has no knowledge. <u>See Alexander</u>, 778 F. Supp. at 1420 ("A principal may be held liable for the intentional acts of its agent if the agent's conduct is within the scope of its agency and if, <u>with knowledge</u> of the conditions, the principal intends the conduct or intends the consequences." (emphasis added) (citing <u>Berger</u>, 843 F.2d at 1430; Restatement of Agency 2d, Section 1 (1958)); <u>see e.g. Alexander v. Local 496, Laborers International Union of North America</u>, 860 F. Supp. 410, 415 (N.D. Ohio 1994) (international found vicariously liable for discrimination by local union where it had knowledge of complaints from EEOC and local officials).

Plaintiff maintains that the APWU ratified Brents' conduct by "actively opposing any attempts to discipline" Brents. Pl.'s Opp'n Br., at 28. Plaintiff apparently is arguing that the APWU represented Brents in a disciplinary proceeding related to Brents' alleged sexual harassment despite the absence of a duty to do so. Plaintiff does not explain what "disciplinary action"

she is referring to; however, the response contained in the
APWU's reply brief suggests that Plaintiff is referring to a
grievance filed by Brents, in which he challenged the Post
Office's issuance of a fourteen day suspension for his alleged
sexual harassment. Declaration of Greg Bell ("Bell Decl."), at ¶
4. With respect to that grievance procedure, the APWU has
provided an affidavit stating that it had no knowledge of the
pursuit of a grievance challenging the discipline issued to
Brents. Id. at ¶ 8. Local unions handle discipline and
discharge grievances at Steps 1 and 2 of the grievance procedure.
Id. at ¶ 7. The APWU does not become involved in the grievance
procedure until Step 3. Id. It claims that the grievance does
not appear to have been appealed to Step 3, and that therefore,
until this lawsuit was filed and the APWU received Fed. R. Civ.
P. Rule 26(a) disclosures, it did not even have any knowledge of
the alleged sexual harassment by Brents. Tunstall Decl., at ¶ 7.
Plaintiff fails to refute the APWU's affidavit with anything more
than mere conclusory assertions.

Additionally, Plaintiff suggests that the APWU had knowledge
because she complained to "union officers, union
representatives," and others concerning the incidents of sexual
harassment, see Amended Compl., at ¶ 38; however, Plaintiff does
not present any evidence that she actually complained or

10

otherwise informed the APWU of the purported harassment.[6]
Moreover, according to the Tunstall Declaration, Plaintiff never
contacted any of its officers, employees, or agents either orally
or in writing to request that a grievance be filed or that some
other action be taken in response to the alleged sexual
harassment committed by Brents.  Tunstall Decl., at ¶¶ 9-10.
Plaintiff's own affidavit supports that assertion.  Therein,
Plaintiff maintains that she was never aware, and continues to be
unaware, "of any Contract clause or other method whereby a
complaint could be made against another member of the union under
the terms of the Collective Bargaining Agreement, concerning
instances of sexual harassment."  Declaration of Lorraine A.
Kokinchak ("Kokinchak Decl."), at ¶ 16, attached to Pl.'s Opp'n
Br. as Ex. I.

     Therefore, the Court concludes that even viewing the
evidence in the light most favorable to Plaintiff, the APWU

_____

     [6]  In response to a May 16, 2000 letter from the APWU
regarding the recently decided Third Circuit case, Angelino, 200
F.3d 73, Plaintiff submitted a letter dated May 23, 2000.  With
that letter, Plaintiff provides an affidavit in which she claims
that she complained to a "Union representative."  As the APWU
notes, this is the first time that Plaintiff has attempted to
submit any evidence of discussions with any union representative.
The APWU contends that submission of evidence in this way and at
this time is inappropriate.  The Court agrees.

     Moreover, because the affidavit does not name the "Union
representative," it is not evident whether it was an APWU
representative to whom Plaintiff allegedly complained.  For these
reasons, the Court will not consider Plaintiff's affidavit dated
May 23, 2000.

neither knew nor should have known of Brents' misconduct;
therefore, the APWU could not have authorized or ratified conduct
of which it had no knowledge.  The claims of vicarious liability
under Title VII and the LAD against the APWU for Brents' wrongful
acts are **dismissed.**

### 2.  The Local

Under both Title VII and the LAD, a local union may be
subject to liability for the acts of its stewards.  See Woods v.
Graphic Communications, 925 F.2d 1195, 1202 (9th Cir. 1991);
Baliko v. Stecker, 275 N.J. Super. 182, 191 (App. Div. 1994); see
also N.J.S.A. 10:5-12b.  Nevertheless, a "'union is not
responsible for every act of a shop steward, simply by virtue of
his position.  If he acts only as an individual rather than
within the authority the union has conferred, the union is
absolved.'"  Badlam v. Reynolds Metals Co., 46 F. Supp.2d 187,
201-02 (N.D.N.Y. 1999) (emphasis added) (citing N.L.R.B. v. Local
815, Int'l Bd. of Teamsters, Chauffers, Warehousemen and Helpers
of America, 290 F.2d 99, 104 (2d Cir. 1961)).

Plaintiff relies on Woods to bolster her argument that the
Local is liable for the acts of Brents under agency principles.
In that case, a black union member, alleging violations of
Washington anti-discrimination law, 42 U.S.C. § 1981, and Title
VII, sued his employer and his union for racial discrimination by
his co-workers, including a co-worker who was the union shop

12

steward and a co-worker who was the union shop committeeman. The
court concluded that the union had both actual and constructive
notice of the pervasively hostile work environment and the
misconduct of its steward. The plaintiff had complained to the
union through the steward and other officials and had asked the
steward at least three times to file a grievance concerning the
hostile work environment. Yet there was no evidence that the
union had filed a grievance or had taken any action against
either the steward or the committeeman. In fact, the union not
only did not deny that racist remarks were made by the steward to
the plaintiff, but also "knew about the situation in the plant,
yet took a conscious stand opposing disciplinary action against
Union members for racial harassment." Woods, 925 F.2d at 1199.
Consequently, the Ninth Circuit determined that the union had
"effectively ratified the harassment." Id. at 1202. Therefore,
it held that under state law, Washington courts "would hold that
racial harassment by union officials, including stewards
entrusted with implementing the grievance process, may constitute
acts of discrimination by a union." Id. (emphasis added).

The Court finds Woods distinguishable from this case. Here,
Plaintiff does not dispute that she never requested the Local to
file a grievance on her behalf or that the Local had refused any
requests by Plaintiff to take action. See discussion supra; see
also Badlam, 46 F. Supp.2d at 202 (concluding that union could

13

not be held liable for the discriminatory actions of the
company's employees "who also happen to be shop stewards" where
the plaintiff never requested that a grievance be filed on her
behalf and where the plaintiff had presented no evidence that the
shop stewards were acting within the scope of their authority as
union representatives or as agents of the union while allegedly
engaging in harassing conduct).

Further, Plaintiff contends that, like the APWU, the Local
also ratified Brents' conduct when it "defended and continue[s]
to defend Jeffrey Brents in a disciplinary action brought as a
result of his acts of sexual harassment against Plaintiff
Kokinchak."[7]  Pl.'s Opp'n Br., at 29.  Plaintiff concludes that
the Local has "taken sides" and chosen to represent Brents
despite the absence of a duty to do so.  Id.

It is well settled that a union violates the statutory duty
of fair representation only when it actions are arbitrary,
discriminatory, or in bad faith.  Vaca v. Sipes, 386 U.S. 171,
190 (1967).  Therefore, "a union may not arbitrarily ignore a
meritorious grievance."  Id. at 191; see also Woods, 925 F.2d at
1203 ("reckless disregard of the rights of an individual member
constitutes an 'arbitrary' failure to represent him."  (citing
Peterson v. Kennedy, 771 F.2d 1244, 1253 (9th Cir. 1985), cert.

---

[7]  The Court will assume that Plaintiff is referring to the
grievance pursued by the Local on behalf of Brents challenging
the issuance of the fourteen day suspension.

denied, 475 U.S. 1122 (1986)).  Conversely, courts have held that "a union need not process meritless grievances."  Woods, 925 F.2d at 1203.

Here, the Local pursued a grievance on behalf of Brents allegedly because the only evidence of improper conduct was from Plaintiff's own testimony.  Unless Brents' claim was meritless, it would have breached the duty of fair representation owed to Brents had it failed to file Brents' grievance.  Plaintiff does not allege and presents no evidence to suggest that the Local knew that Brents' grievance had no merit.  Rather, according to Plaintiff, the Local should not have filed a grievance on behalf of Brents because a union has no obligation to represent members in disciplinary proceedings that stem from charges of sexual harassment.  The Court rejects Plaintiff's theory.  If Plaintiff is correct, a union would be unable to file a grievance on behalf of anyone contesting the imposition of discipline stemming from charges involving harassment or discrimination notwithstanding whether the grievance is meritorious.

Further, Plaintiff has presented no evidence that Brents was acting within the scope of his authority as a union representative or as an agent of the Local when he purportedly engaged in the sexually harassing behavior at Plaintiff's personal residence.  Amended Compl., at ¶¶ 16, 48.

Brents was also not acting within the scope of his authority

15

as a union representative or agent of the Local when he allegedly
harassed Plaintiff in the workroom floor.  Plaintiff has not
alleged that she and Brents were conducting any union related
business when Brents sexually harassed her or that Brents
conditioned the filing of a grievance or the performance of any
union duty on Plaintiff succumbing to his advances.  Moreover,
Defendants maintain, and Plaintiff does not dispute, that the
Management Rights Clause, Article 3 of the CBA between the APWU
and the United States Postal Service gives to the Postal Service
the exclusive authority to control its employees on the workroom
floor.  Tunstall Decl., at ¶ 8, Ex. 3, 4.  Plaintiff's claims of
vicarious liability against the Local under Title VII and LAD are
**dismissed.**

  C.   Direct Liability

     Plaintiff argues that the Unions had an affirmative duty to
combat harassment in the workplace.  To support that assertion,
Plaintiff relies in part on Goodman v. Lukens Steel Co., 777 F.2d
113 (3d Cir. 1985), aff'd 482 U.S. 656 (1987).  In that case, the
unions argued that mere passivity should not subject them to
liability under Title VII.  The Third Circuit recognized that
some cases have held that "there is an affirmative duty on the
part of the unions to combat discrimination in the workplace."
Id. at 126; see e.g. Bonilla v. Oakland Scavenger Co., 697 F.2d
1297, 1304 (9th Cir. 1982) ("[t]he union has an affirmative

16

obligation to oppose employment discrimination against its members. If instead it acquiesced or joined in the Company's discriminatory practices, it too is liable to the injured employees").

The Third Circuit, however, did not rely on or expressly adopt the affirmative duty argument because it found that in the case before it, the unions had done more than merely acquiesce in the discrimination. On appeal to the Supreme Court, the unions again argued that they did not have an affirmative duty to oppose the employer's racially discriminatory employment practices. The Court declined to discuss "this rather abstract observation," because it agreed with the courts below that the record showed more than mere passivity by the unions. Goodman, 482 U.S. at 666. The Court, however, did interpret the Third Circuit's opinion as "appear[ing] to hold that the Unions had an affirmative duty to combat employer discrimination in the workplace." Id. at 666-67.

Following Goodman, some courts have held that a union has an affirmative duty to oppose discrimination, while others have not. Compare Woods, 925 F.2d at 1200 ("A union may also be liable under Title VII for acquiescing in a racially discriminatory work environment"), with Martin v. Local 1513 & District 118 of the Int'l Ass'n of Machinists & Aerospace Workers, 859, F.2d 581, 584 (8th Cir. 1988) (noting that difficulty with plaintiff's

17

"liability by way of acquiescence" argument was that neither the
Eight Circuit nor the Supreme Court in Goodman, 482 U.S. at 656-
66, adopted that theory; rather, in Goodman, the Court "took
great pains to point out that both the district court and the
Third Circuit had held that the case against the unions 'was much
stronger than one of mere acquiescence'"); Carter v. Chrysler
Corp., 1988 U.S. Dist. LEXIS 21975, *4-5 (E.D. Mo. 1998)
(dismissing claims against local union because "it has not been
established that a union is liable for merely acquiescing or
remaining passive in the face of impermissible discrimination by
the employer"), aff'd in relevant part, 173 F.3d 693 (8th Cir.
1999).

The Court need not determine whether the Unions have an
affirmative duty because in this case, even assuming that that
duty does exist, viewing the evidence in the light most favorable
to Plaintiff, neither of the Unions breached any such duty, as
discussed below.

1.    The APWU

Plaintiff contends that the APWU breached its affirmative
duty to combat sexual harassment in the workplace by failing to
adopt and implement a proper sexual harassment policy which was
publicized and enforced, and that such failure renders it liable
for negligence under agency principles, Restatement of Agency 2d,
§§ 213, 214.

18

Plaintiff's argument has no merit.  First, agency principles apply to determine the vicarious liability of a union, as opposed to its direct liability.  See Berger, 843 F.2d at 1429-30.  Here, Plaintiff argues in her opposition brief that the APWU is directly liable for its alleged negligence in failing to institute proper and effective anti-sexual harassment policies.  Plaintiff, however, has not plead negligence as a cause of action against the APWU.

Second, the Court is unaware of any law that imposes on a union an affirmative duty to publicize and enforce anti-sexual harassment policies at a member's personal residence.  As for the workplace, it is the employer, rather than the APWU, that has easy access to the workplace so that it can post anti-sexual harassment policies; moreover, unlike an employer, a union does not have an employment handbook or manual that it distributes to its employees.  Therefore, it is the employer's duty, rather than that of the union (where Plaintiff was not employed), to have an effective anti-sexual harassment policy in place.  Cf. Agelino, 200 F.3d at 96 (noting that the employer "was the party responsible for assigning work to the appellants and ensuring that the work place was not contaminated with sex and race-based discrimination and harassment").  In any event, as noted by the APWU, under Title VII and the LAD, the presence of an effective anti-sexual harassment policy is an affirmative defense to

19

potential liability, not an affirmative requirement to ascertain
whether a defendant is even subject to liability.  Therefore,
assuming that the APWU had an affirmative to combat sexual
harassment, the Court does not agree with Plaintiff that
maintaining and posting an effective anti-sexual harassment
policy at the workplace is part of that duty.

In any event, "[a]cquiescence requires (1) knowledge that
prohibited discrimination may have occurred and (2) a decision
not to assert the discrimination claim."  York v. American Tel. &
Tel. Co., 95 F.3d 948, 956 (10th Cir. 1996) (citing Goodman, 482
U.S. at 669); see also Alexander, 778 F. Supp. at 1420-21 ("A
labor organization in some circumstances has an affirmative duty
to oppose discriminatory practices of its affiliated locals.
Whether an affirmative duty exists depends on whether there was a
substantial connection between the International Union and the
local such that the International Union would both know of the
discriminatory practices and be expected to intervene to oppose
them.")  Here, Plaintiff has not shown that there are genuine
issues of material fact regarding whether the APWU had any
knowledge of the purported discrimination, see discussion supra;
therefore, the APWU could not have breached any affirmative
obligation to oppose employment discrimination against its
members by instead acquiescing or joining in the employer's
discriminatory practices.

Even if the APWU should have had knowledge, "[m]ere constructive knowledge of possible illegal activity on the local level is not sufficient to impose a legal duty to intervene on the International Union" in the absence of other evidence of agency between the international and local unions.  Brenner, 927 F.2d at 1289; see also International Brotherhood of Electrical Workers, 476 F. Supp. at 344 n.4 ("We will not infer ratification from [the International's] inaction where it is unclear whether a duty to act exists.")

Accordingly, the APWU is not liable under either Title VII or the LAD for failure to comply with an affirmative duty to alleviate the alleged sexual harassment that was occurring in Plaintiff's workplace.  Defendant APWU's motion for summary judgment is **granted**.  All claims against Defendant APWU are **dismissed.**[8]

### b.    The Local

Assuming that the Local knew that the prohibited discrimination may have occurred, to establish that the Local acquiesced in the discrimination, Plaintiff must still show that the Local decided not to assert the discrimination claim.  York, 95 F.3d at 956.  Plaintiff has not alleged that the Local refused her requests to assert a harassment claim; in fact, she has not

---

[8]  In light of the Court's rulings, the Court need not address the alternate theories upon which the APWU moves for dismissal of the claims against it.

21

disputed that she never requested that a grievance be filed on her behalf. See discussion supra.

Therefore, Plaintiff's claims against the Local for breach of an affirmative duty necessarily fails. Those claims are **dismissed**.

D.    Breach of Duty of Fair Representation

Plaintiff contends that in violation of Title VII,[9] the Unions breached their duty of fair representation by not taking appropriate action in response to the acts of sexual harassment. See Amended Compl., at ¶ 68.

"To establish a prima facie Title VII claim against a union for a breach of its duty of fair representation, a plaintiff must show that (1) the employer violated the collective bargaining agreement with respect to the plaintiff, (2) the union permitted the violation to go unrepaired, thereby breaching the union's duty of fair representation, and (3) there was some indication that the union's actions were motivated by discriminatory animus." York, 95 F.3d at 955-56 (citing Babrocky v. Jewel Food Co. & Retail Meatcutters Union, Local 320, 773 F.2d 857, 868 (7th Cir. 1985)). Once the plaintiff makes a prima facie showing, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for failing to pursue plaintiff's

---

[9]    Plaintiff does not allege a breach of the duty of fair representation pursuant to the National Labor Relations Act ("NLRA"). Pl.'s Opp'n Br., at 32.

grievances.  <u>Walker v. Pepsi-Cola Bottling Co.</u>, 2000 WL 1251906,
at *8 (D. Del. Aug. 10, 2000).  If the defendant meets its
burden to establish such a reason, the plaintiff then must
demonstrate that the defendant's reasons are pretextual.  <u>Id.</u>

Here, the Court need not engage in an extensive burden
shifting analysis because Plaintiff has not presented facts
sufficient to meet her initial burden.  Even assuming that the
employer violated the CBA by permitting sexual harassment,
Plaintiff has failed to demonstrate any evidence of the second
and third factors.  In addition to the absence of a showing that
the Unions' actions were motivated by discriminatory animus, the
Unions cannot be expected to repair the employer's violation of
the CBA when Plaintiff failed to even request that a grievance be
filed on her behalf.  <u>See</u> <u>Badlam</u>, 46 F. Supp.2d 187.

In <u>Badlam</u>, three female employees who worked for the
defendant company, sued the company and their union alleging
violations of Title VII and state law.  With respect to one of
the plaintiffs, that plaintiff had brought her allegations of
harassment to the attention of union officials on numerous
occasions.  Some of the allegations involved the alleged improper
conduct of union stewards.  Therefore, the union had knowledge of
those actions, and in response, attempted to remedy the situation
by conducting meetings with the plaintiff's supervisors, co-
workers, and members of the company's management and personnel

23

department.  Although union officials also advised the plaintiff

to complain to the company's personnel department and to follow

the company's sexual harassment policy, the plaintiff never

requested the Union to file a grievance on her behalf.  The court

noted that this was of significance because

> [w]ithout the filing of a written grievance
> or otherwise specifically requesting that the
> Union pursue a grievance to the next step,
> the Union was under no obligation to take
> further action on her behalf.  . . .  [The
> plaintiff's] unilateral expectation that the
> Union enforce her right to a discrimination
> free work environment guaranteed by the CBA
> [citations omitted] is insufficient to
> trigger the Union's duties.

Badlam, 46 F. Supp.2d at 201.  Consequently, the court held that

no rational jury could conclude that the union breached its duty

of fair representation.

Plaintiff attempts to excuse her failure to request the

filing of a grievance on her behalf by contending that she was

never aware, and continues to be unaware of procedures governing

the filing of any grievance, Kokinchak Decl., at ¶ 16; however,

"[u]nion members have a duty to become aware of the nature and

availability of union remedies."  Evangelista v. Inlandboatmen's

Union of Pacific, 777 F.2d 1390, 1397 (9th Cir. 1985) (citing

Fristoe v. Reynolds Metals Co., 615 F.2d 1209, 1214 (9th

Cir.1980)).  "The union's failure to inform a union member of the

existence of a union appeals process does not excuse the member's

ignorance."  Id.; see also Peterson, 771 F.2d at 1255-56

24

(concluding that union did not breach duty of fair representation by incorrectly advising employee to file an "injury grievance" under the injury protection clause of the collective bargaining agreement and failing to rectify its error while there was still time to do so).

The Court finds that Plaintiff has not produced sufficient evidence for a rational jury to be able to conclude that the Unions breached their duty of fair representation. Those claims will be **dismissed**.

III. <u>CONCLUSION</u>

For the reasons noted herein, the APWU's motion for summary judgment is hereby **granted**; the Local's motion for summary judgment is **granted**.

An appropriate order follows.

_____
WILLIAM G. BASSLER, U.S.D.J.

Date: 12/29/2000

25

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LORRAINE A. KOKINCHAK,

      Plaintiff,

v.

UNITED STATES POST OFFICE (WILLIAM
J. HENDERSON, POSTMASTER GENERAL),
AMERICAN POSTAL WORKERS UNION (APWU)
(NATIONAL), AMERICAN POSTAL WORKERS
UNION, AFL-CIO, RED BANK LOCAL, AND
JEFFREY BRENTS,

      Defendants.

Civ. No. 99-4835 (WGB)

O R D E R

    This matter having come before the Court on the motion of
Defendant American Postal Workers Union (APWU) (National) for
summary judgment pursuant to Fed. R. Civ. P. Rule 56 or in the
alternative, to dismiss the Complaint pursuant to Rule 12(b)(6),
and the motion of Defendant American Postal Workers Union, AFL-
CIO, Red Bank Local for summary judgment pursuant to Fed. R. Civ.
P. Rule 56 or in the alternative, to dismiss the Complaint
pursuant to Rule 12(b)(6); and

    The Court having considered the submissions of counsel; and

    The Court having decided this matter without oral argument
pursuant to Fed. R. Civ. P. 78; and

    For the reasons stated in the Court's Opinion filed this

26

day; and

For good cause shown;

It is on this **29** day of _December_____, 2000 hereby ORDERED

that the APWU's motion for summary judgment is **granted**; and

IT IS FURTHER ORDERED that all claims against the APWU are

**dismissed**; and

IT IS FURTHER ORDERED that the Red Bank Local's motion for

summary judgment is **granted**; and

IT IS FURTHER ORDERED that all claims against the Red Bank

Local are **dismissed**.

_____
WILLIAM G. BASSLER, U.S.D.J.